
DA 08-0499

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 166

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DAVID W. GUNDERSON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 07-0632
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Joslyn Hunt, Chief Appellate Defender, Sarah Chase Rosario y Naber
(argued), Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General, Tammy K. Plubell (argued),
Assistant Attorney General, Helena, Montana

          Dennis Paxinos, Yellowstone County Attorney, Ann Marie McKittrick,
Deputy County Attorney, Billings, Montana

                      Argued and Submitted: May 14, 2010

                                  Decided: July 27, 2010

Filed:

          _____
                            Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 After a jury trial in Yellowstone County, David Gunderson was convicted of burglary and attempted sexual intercourse without consent. The District Court for the Thirteenth Judicial District determined that Gunderson was a persistent felony offender; hence the court sentenced him to 100 years in prison on the burglary charge along with a consecutive term of life in prison on the charge of attempted sexual intercourse without consent. Both sentences are to be served without the possibility of parole. Gunderson appeals his conviction and sentence. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

¶2 Gunderson raises nine issues on appeal which we have restated as follows:

¶3 1. Whether the District Court erred in sentencing Gunderson to both life imprisonment on the charge of attempted sexual intercourse without consent and a term of 100 years as a persistent felony offender on the burglary charge.

¶4 2. Whether there was sufficient evidence to support Gunderson's conviction on the charge of attempted sexual intercourse without consent.

¶5 3. Whether Gunderson's trial counsel provided effective assistance.

¶6 4. Whether Gunderson was entitled to a jury instruction on missing evidence.

¶7 5. Whether the District Court abused its discretion in denying Gunderson's motion for a mistrial after a prospective juror's comments inadvertently indicated that Gunderson had been in jail.

¶8 6. Whether the District Court erred when it failed to remove a prospective juror for cause.

2

¶9    7. Whether the District Court erred when it declined to give a jury instruction specifying that Gunderson's testimony should be treated the same as any other witness.

¶10   8. Whether the District Court erred in instructing the jury on the definitions of "purposely" and "knowingly."

¶11   9. Whether the District Court erred in imposing 51 conditions as part of Gunderson's sentence in the event he is ever released to the community.

¶12   M. R. App. P. 12(1)(f) requires that parties cite to relevant authorities and statutes in support of their arguments on appeal. In this case, other than citing to the Ninth Circuit Court Model Criminal Jury Instructions from which Gunderson obtained the instruction at issue, Gunderson failed to cite to any statutes or caselaw in support of his argument that the District Court should have given a jury instruction specifying that his testimony should be treated the same as any other witness (Issue 7). We have repeatedly held that it is not this Court's obligation to conduct legal research on behalf of a party or to develop legal analysis that might support a party's position. *State v. Cybulski*, 2009 MT 70, ¶ 13, 349 Mont. 429, 204 P.3d 7 (citing *State v. Torgerson*, 2008 MT 303, ¶ 36, 345 Mont. 532, 192 P.3d 695). Consequently, because of Gunderson's inadequate briefing on Issue 7, we decline to consider his arguments on that issue.

### Factual and Procedural Background

¶13   On July 3, 2007, at around 2:00 a.m., Stephanie Randall walked home to her apartment after an evening of drinking with friends at the nearby Rainbow Bar in Billings. When she arrived home, she went to her kitchen to make herself something to eat. Gunderson, who was hanging out in the area near Randall's apartment drinking with

3

a friend, later testified that he thought he recognized Randall from the bar so he knocked on her door. When Randall answered the door, Gunderson asked to use her telephone. Randall lied and told him she did not have a phone and shut the door. Randall returned to her cooking and after finishing her food, she shut off the lights in her apartment and went to her bedroom to sleep.

¶14    About a half an hour after Randall turned off her lights, Gunderson again went to her door to talk to her. Gunderson testified that he found Randall's door slightly ajar, so he stepped inside. However, Randall testified that she had shut the door but she could not remember whether she had locked it. After entering Randall's apartment, Gunderson called out asking whether anyone was home. He claimed he heard what sounded like a voice coming from the back of the apartment so he followed the voice.

¶15    Randall was asleep on the bed, partially covered by a sheet with her back to the doorway. Because of the heat, Randall was wearing only her bottom underwear. Gunderson testified that he sat down on the edge of the bed to talk with her. Randall testified that she "woke up to somebody getting in my bed and touching me and kissing me." She said that the person, whom she later identified as Gunderson, kissed her on her neck and that he was rubbing her thigh. She also said that Gunderson tried to pull her underwear off, but she was able to grab his hand to stop him. Randall further testified that Gunderson pinned her arms down on the bed, but after several minutes of struggling with him, she was able to get up and turn on the bedroom light. Once the lights were on, she recognized Gunderson as the man who had asked to use her telephone earlier that night. She also noticed that Gunderson was not wearing his shirt or his shoes.

4

¶16    Randall grabbed Gunderson's shoes, threw them out her front door, and ordered Gunderson to get out. She testified that when she went to open the door, it was locked, so she surmised that if Gunderson had come in through the front door, he had locked it behind him. On his way out the door, Gunderson dropped his shirt. When he went back to pick it up, Randall grabbed him by the hair and tried to drag him out of the apartment. In the process, she scratched his neck.

¶17    Once she was able to get Gunderson out of her apartment, Randall called 911 to report the incident. Officer Shawn Wichman responded to her call. He testified that when he arrived to interview Randall, she was very distraught and visibly shaking, but she did not appear to have any injuries. Although Officer Wichman examined Randall's bed, he did not collect her bedding or underwear as evidence. Officer Wichman transported Randall to the Billings Police Department where a detective took samples of the dried blood on her hand and under her fingernails. This blood evidence was sent to the Montana Crime Lab where it was tested and eventually identified as belonging to Gunderson.

¶18    Officer Brad Ross, responding to a dispatch that a burglary suspect had fled the scene, encountered Gunderson walking a few blocks from Randall's apartment with another man. Based on the physical description given by Randall and the fact that Gunderson had scratch marks on his neck with fresh, wet blood, Officer Ross stopped Gunderson. Gunderson consented to a portable breath test which indicated a blood alcohol content of 0.086. Officer Ross arrested Gunderson for violating his parole. After Officer Ross advised him of his *Miranda* rights, Gunderson agreed to be interviewed.

5

Gunderson initially stated that he received the scratch marks during a fight at the Crystal Lounge and that he had been asked to leave the Crystal Lounge by one of the staff. He also stated that he had arrived at the Crystal Lounge that night by taxi and that he had jumped out of the taxi without paying. Gunderson denied entering any residences without authorization and stated that his DNA would not be present at the crime scene.

¶19 On July 19, 2007, the State charged Gunderson by Information with burglary and attempted sexual intercourse without consent. The burglary charge alleged that Gunderson unlawfully entered Randall's apartment with the purpose to commit sexual assault. The attempted sexual intercourse without consent charge alleged that Gunderson "climbed into [Randall's] bed, tried to pull her underwear down, and kissed her neck while she slept" with the purpose to commit sexual intercourse without consent.

¶20 The Office of the Public Defender eventually assigned Robert Kelleher to represent Gunderson. On October 19, 2007, the State filed a notice of intent to seek Gunderson's designation as a persistent felony offender. The State also filed a *Just* notice seeking to use Gunderson's 1994 conviction for sexual intercourse without consent. Although the District Court granted the State's request, the State did not introduce any evidence at trial regarding Gunderson's prior convictions.

¶21 On February 15, 2008, Gunderson filed a Motion to Dismiss for Loss of Evidence arguing that because the police failed to collect Randall's bedding and failed to perform a rape examination of Randall, the case should be dismissed. Gunderson contended that the bedding would have shown an absence of fighting or resistance and the rape

6

examination would have shown that Randall did not have any bruises. The District Court denied the motion.

¶22 The trial in this case began on February 19, 2008. During voir dire, one of the potential jurors, David Thorson, indicated that he worked at the Yellowstone County Detention Facility. When asked by the prosecutor if he knew Gunderson, Thorson responded that he did. Based on this exchange, Gunderson moved for a mistrial on the grounds that Thorson's comments had tainted the jury pool by indicating that Gunderson had been in jail or was currently in jail. The District Court denied the motion and the State subsequently used one of its peremptory challenges to remove Thorson from the jury panel.

¶23 Also during voir dire, another juror, Denise Jensen, expressed the opinion that she would "probably have more of a bias that [Gunderson] is [guilty] simply because he's charged." Kelleher questioned Jensen at length regarding this statement and Jensen eventually indicated that she thought she could be fair. Kelleher did not challenge Jensen for cause and, instead, removed her with a peremptory challenge.

¶24 On the second day of trial, Gunderson requested to speak with the judge regarding Kelleher's performance, so the judge met with Gunderson and Kelleher in chambers. Gunderson expressed his concerns that Kelleher failed to properly impeach Randall with her prior statements; failed to investigate and call as a witness the driver of the taxi that drove Gunderson to the Crystal Lounge or the bouncer that kicked Gunderson out of the Crystal Lounge; failed to communicate with Gunderson in a timely manner; failed to alert Gunderson that the State had photos showing blood on Randall's hand; and failed to call

Gunderson's nephew as a witness regarding the taxi and the events at the Crystal Lounge. Gunderson indicated that although he had not brought this to the court's attention previously, he had been expressing his concerns to Kelleher for several months, and he had written several letters to the Office of the Public Defender.

¶25 Kelleher responded that he was still attempting to locate a bouncer at the Crystal Lounge who might recognize Gunderson, as well as a taxi driver who may have given Gunderson a ride there. With respect to his cross examination of Randall, Kelleher expressed his understanding that Gunderson's main concern was that Kelleher did not attempt to impeach Randall's testimony that Gunderson had pulled one side of her underwear down several inches with her prior statement that she had made sure her underwear stayed on and were not pulled off. Kelleher opined that any inconsistency between these two statements was "*de minimis*."

¶26 When the judge asked Gunderson what he wanted the court to do at this stage in the proceedings, Gunderson responded that he did not want to waive any of his rights but that he felt Kelleher was ineffective. The judge stated that he was not going to replace counsel or declare a mistrial. Instead, he said that, although he would "strongly urge" Gunderson not to, he would allow Gunderson to represent himself and keep Kelleher on as standby counsel. After further discussion regarding Kelleher's attempt to locate witnesses, the judge declined to remove Kelleher as counsel and agreed to allow the defense additional time to present evidence in the event Gunderson was able to locate potential witnesses.

¶27 After trial resumed, the State called as a witness the bouncer who was working at the Crystal Lounge the night of the alleged incident. He testified that he did not remember kicking Gunderson or anyone else out of the bar that night. The State also introduced testimony from the owners of the two taxi companies in Billings. They both testified that their company records did not indicate anyone being dropped off at the Crystal Lounge during the night and time in question, nor did their records indicate any unpaid fares that night. Following the close of the State's case-in-chief, Kelleher moved to dismiss for insufficient evidence. The District Court denied the motion.

¶28 Gunderson was the only witness to testify in his defense. He admitted that he had been in Randall's apartment and that his statement that he had been injured in a bar fight was untrue. Gunderson maintained, however, that the rest of his story regarding the taxi ride and being kicked out of the bar, was true. The District Court made no further inquiry of Kelleher regarding why none of the witnesses identified and requested by Gunderson were called.

¶29 During the settling of jury instructions, Kelleher did not object to any of the State's offered instructions. Kelleher did offer two instructions that were opposed by the State. The first of these instructions sought to instruct the jurors to treat defendant's testimony "just as you would the testimony of any other witness." The second instruction sought to instruct the jurors that they could infer from the State's failure to preserve Randall's bedding and to perform a rape examination of Randall, that this missing evidence would have been adverse to the State's case. The District Court declined to give either of these instructions.

9

¶30 The jury returned a verdict of guilty on each count. Thereafter, Kelleher filed a motion for a new trial arguing that a new trial was warranted because of the court's refusal to give Gunderson's two proposed jury instructions, the prospective juror's comments indicating that Gunderson had been in jail, and the State's failure to present sufficient evidence to support a conviction. After hearing oral argument, the court denied the motion.

¶31 At sentencing, Kelleher raised several factual disagreements with the presentence investigation report (PSI) of Gunderson's criminal history, but made no other objections to the sentence or its conditions. The PSI noted that the instant offense occurred only six weeks after Gunderson was released from prison to serve the suspended portion of his 1994 sentence on a rape conviction. The District Court determined that Gunderson was a persistent felony offender and sentenced him to 100 years in prison on the burglary charge and a consecutive term of life in prison on the charge of attempted sexual intercourse without consent, both to be served without the possibility of parole. The District Court also designated Gunderson a Level 3 sexually violent offender based on the recommendations in the psychosexual evaluation in the PSI. In its written judgment filed August 27, 2008, the court imposed 51 conditions on Gunderson should he ever be released to the community.

¶32 Gunderson now appeals his conviction and sentence.

**Issue 1.**

¶33 *Whether the District Court erred in sentencing Gunderson to both life imprisonment on the charge of attempted sexual intercourse without consent and a term of 100 years as a persistent felony offender on the burglary charge.*

10

¶34 In imposing sentence on the burglary charge, the District Court explained that while a conviction for burglary normally carries a 20-year maximum penalty, because Gunderson was designated a persistent felony offender, the court intended to sentence him to 100 years on that charge pursuant to § 46-18-502, MCA. In addition, on the charge of attempted sexual intercourse without consent, the court sentenced Gunderson to life in prison without the possibility of parole. The court remarked that it had never seen a defendant more deserving of a life sentence than Gunderson and concluded:

> I designate you a Level 3 sex offender, that's the highest level. I believe that your past actions indicate that if there was any chance that you would get out of prison, it would virtually guarantee that there would be more victims, and I will not be a party to that. And this community, or any community, in this case, or in the United States should not have to be subjected to more of your crimes.

¶35 Gunderson contends on appeal that the District Court erred in imposing sentence because once the court designated him a persistent felony offender and sentenced him to 100 years in prison on the burglary charge, it could not also sentence him to a life sentence on the charge of attempted sexual intercourse without consent. Gunderson argues that pursuant to this Court's holding in *State v. Gaither*, 2009 MT 391, ¶ 54, 353 Mont. 344, 220 P.3d 640, when a defendant has been convicted of multiple felonies in a single proceeding, and the defendant is being sentenced as a persistent felony offender, "the plain language of § 48-16-502(2), MCA, prohibit[s] a term of imprisonment of more than 100 years." Thus, Gunderson maintains that pursuant to this Court's holding in *Gaither*, his sentence is illegal and must be remanded to the District Court for resentencing.

11

¶36    The State argues on the other hand that we should revisit our holding in *Gaither* because it conflicts with our prior precedent on sentencing persistent felony offenders. The State contends that our holding in *Gaither* that a persistent felony offender may not be sentenced to more than 100 years leads to the unjust result of subjecting non-persistent felony offenders to greater sentences than persistent felony offenders.

*A. Standard of Review*

¶37    We clarified our standard of review for criminal sentences in *State v. Herd*, 2004 MT 85, 320 Mont. 490, 87 P.3d 1017. We held in *Herd*, that if the offender is statutorily eligible for sentence review, we will review the sentence for legality only. *Herd*, ¶ 22. If, however, the offender is statutorily ineligible for sentence review, then we will utilize the two-tiered approach which we employed prior to the creation of the Sentence Review Division. In other words, we will review such sentences for both legality and abuse of discretion. *Herd*, ¶ 22.

¶38    In the instant case, because Gunderson was sentenced to more than one year of actual incarceration, he is statutorily eligible for sentence review. *See* § 46-18-903, MCA. Consequently, we will review his sentence for legality only.

*B. Discussion*

¶39    We find persuasive the State's argument that our holding in *Gaither* leads to the unjust result of subjecting non-persistent felony offenders to greater sentences than persistent felony offenders. Consequently, we use this opportunity to revisit our decision in *Gaither,* and to clarify the proper procedure for sentencing persistent felony offenders.

12

¶40 Gaither was sentenced to ten years in Montana State Prison (MSP) on a charge of criminal endangerment, and 85 years in MSP on a charge of attempted sexual abuse of children. Gaither was also designated a persistent felony offender and sentenced to an additional 50 years in MSP with ten suspended. *Gaither*, ¶ 1.

¶41 On appeal, Gaither did not dispute his designation as a persistent felony offender. Instead, he argued that the maximum sentence he could receive as a persistent felony offender was 100 years. Hence, he argued that his sentence, which totaled 135 years, was contrary to § 46-18-502, MCA,[1] and, therefore, illegal. *Gaither*, ¶ 51.

---

[1] Section 46-18-502, MCA, reads as follows:

**Sentencing of persistent felony offender.** (1) Except as provided in 46-18-219 and subsection (2) of this section, a persistent felony offender shall be imprisoned in the state prison for a term of not less than 5 years or more than 100 years or shall be fined an amount not to exceed $50,000, or both, if the offender was 21 years of age or older at the time of the commission of the present offense.

(2) Except as provided in 46-18-219, an offender shall be imprisoned in a state prison for a term of not less than 10 years or more than 100 years or shall be fined an amount not to exceed $50,000, or both, if:

(a) the offender was a persistent felony offender, as defined in 46-18-501, at the time of the offender's previous felony conviction;

(b) less than 5 years have elapsed between the commission of the present offense and:

(i) the previous felony conviction; or

(ii) the offender's release on parole, from prison, or from other commitment imposed as a result of the previous felony conviction; and

(c) the offender was 21 years of age or older at the time of the commission of the present offense.

(3) Except as provided in 46-18-222, the imposition or execution of the first 5 years of a sentence imposed under subsection (1) of this section or the first 10 years of a sentence imposed under subsection (2) of this section may not be deferred or suspended.

(4) Any sentence imposed under subsection (2) must run consecutively to any other sentence imposed.

¶42 The State argued in *Gaither* that the sentence available under the persistent felony offender statute can be applied to specific crimes in order to augment the overall sentence available for a defendant being sentenced for more than one felony. *Gaither*, ¶ 52. We disagreed, however, and held that once the State opts to seek a persistent felony offender designation and a district court proceeds to impose it, the plain language of § 46-18-502(2), MCA, prohibits a term of imprisonment of more than 100 years. In other words, we held that the persistent felony offender statutes do not give a district court the authority to mix and match a persistent felony offender sentence with another felony conviction occurring in the same proceeding, and to exceed the 100-year limit for imprisonment. *Gaither*, ¶ 54.

¶43 In reaching this holding in *Gaither*, we incorrectly stated that we had not yet considered whether § 46-18-502(2), MCA, permitted a district court to impose a sentence for a term of imprisonment exceeding 100 years in cases where a defendant is being sentenced as a persistent felony offender, and has been convicted of multiple felonies in a single proceeding. *Gaither*, ¶ 53. We had, in fact, considered this issue in both *State v. Watson*, 211 Mont. 401, 686 P.2d 879 (1984), and *State v. Fitzpatrick*, 247 Mont. 206, 805 P.2d 584 (1991). And, even though our holding in *Gaither* was contrary to our holdings in both *Watson* and *Fitzpatrick*, we did not overrule these cases. Indeed, both of these cases stand as a line of authority contrary to *Gaither*.

¶44 The defendant in *Watson* was convicted by a jury of attempted deliberate homicide, aggravated assault, and burglary. The court designated him a dangerous offender as well as a persistent felony offender. He was sentenced to 100 years

14

imprisonment without the possibility of parole for each of the three felony offenses, with the sentences to run consecutively, for a total sentence of 300 years. *Watson*, 211 Mont. at 404, 406, 686 P.2d at 880, 881. We stated in *Watson* that Watson's sentence of 300 years was within the statutory maximum allowable for a persistent felony offender. *Watson*, 211 Mont. at 420, 686 P.2d at 889 (citing § 46-18-502(2), MCA).

¶45 Similarly, in *Fitzpatrick*, the defendant was being held in the Yellowstone County Detention Facility pending sentencing following a plea of guilty to deliberate homicide, aggravated kidnapping, and robbery. Defendant escaped from the facility along with six other inmates. He was recaptured the following morning after committing a burglary. *Fitzpatrick*, 247 Mont. at 207, 805 P.2d at 585.

¶46 At sentencing, Fitzpatrick was designated a persistent felony offender. The court sentenced him to serve ten years for the escape and five years for the burglary. The court also sentenced him to an additional 100 years for each conviction as a persistent felony offender. Fitzpatrick appealed these sentences. *Fitzpatrick*, 247 Mont. at 207, 805 P.2d at 585.

¶47 We stated in *Fitzpatrick* that § 46-18-502, MCA, "provides for a maximum term of 100 years for a persistent felony offender, not an additional term of 100 years . . . . The sentencing parameters of § 46-18-502, MCA, *replace* the maximum sentence prescribed for the offense. It is not a sentence *in addition to* the sentence for the offense." *Fitzpatrick*, 247 Mont. at 208, 805 P.2d at 586 (emphasis added). We also pointed out in *Fitzpatrick* that "the District Court could have properly sentenced

15

Fitzpatrick to serve a maximum of 100 years for escape *and* 100 years for burglary under § 46-18-502, MCA." *Fitzpatrick*, 247 Mont. at 208, 805 P.2d at 586 (emphasis added).

¶48 In addition, § 46-18-502(4), MCA, provides that "[a]ny sentence imposed under subsection (2) [regarding repeat persistent felony offenders] must run *consecutively* to any other sentence imposed. [Emphasis added.]" Clearly this statute contemplates that a persistent felony offender could serve more than 100 years since sentences under this subsection must run consecutively. In other words, if a persistent felony offender received two 100-year sentences under § 46-18-502(2), MCA, those sentences must be served consecutively for a total of 200 years.

¶49 Based on the foregoing, we conclude that our holding in *Gaither* was an incorrect statement of the law and contrary to our prior holdings in *Watson* and *Fitzpatrick,* and contrary to § 46-18-502(4), MCA. Consequently, we overrule *Gaither* to the extent that it provides that the persistent felony offender statutes "do not give [district courts] the authority to mix and match a [persistent felony offender] sentence with another felony conviction occurring in the same proceeding and exceed the 100-year limit for imprisonment." *Gaither*, ¶ 54.

¶50 We also overrule *State v. Gunderson*, 282 Mont. 183, 936 P.2d 804 (1997), and *State v. Robinson*, 2008 MT 34, 341 Mont. 300, 177 P.3d 488, because they too perpetuate incorrect statements of the law regarding persistent felony offender sentences.

¶51 The 1997 *Gunderson* case involved the same defendant as in the instant case. In that earlier case (*Gunderson I*), Gunderson was sentenced to twenty years in prison for sexual intercourse without consent. He was sentenced to an additional ten years as a

16

persistent felony offender. *Gunderson I*, 282 Mont. at 187, 936 P.2d at 806. In his appeal in that case, Gunderson correctly argued that persistent felony offender sentences *replace* the maximum sentence for the underlying offense and cannot be imposed in addition to a separate sentence for the underlying offense. However, in our analysis of that issue, we misread *Fitzpatrick* and apparently ignored the language in that case that stated: "The sentencing parameters of § 46-18-502, MCA, *replace* the maximum sentence prescribed for the offense. It is not a sentence *in addition to* the sentence for the offense." *Fitzpatrick*, 247 Mont. at 208, 805 P.2d at 586 (emphasis added). Thus, we wrongly held in *Gunderson*, that sentences imposed based on a defendant's status as a persistent felony offender are in addition to any separate sentences for the underlying offenses. *Gunderson I*, 282 Mont. at 187-88, 936 P.2d at 806-07.

¶52 In a similar fashion, we perpetuated the error we made in *Gunderson* in our holding in *Robinson*. The District Court sentenced Robinson to two concurrent ten-year prison terms for the offenses of assault on a peace officer along with two consecutive ten-year prison terms because Robinson was designated a persistent felony offender. The court also sentenced Robinson to five years in prison for failing to register as a sexual offender along with an additional five-year sentence because of Robinson's persistent felony offender status. *Robinson*, ¶ 6. On appeal, while we pointed out in *Robinson* that the district court erred by imposing the persistent felony offender sentences on top of the sentences for the actual offenses themselves, we held that because the sentences were, in total, well below the maximum provided for by § 46-18-502(2), MCA, the sentences were not illegal. *Robinson*, ¶ 18.

17

¶53 We explained the correct procedure for sentencing under the persistent felony offender statutes in *State v. DeWitt*, 2006 MT 302, ¶ 11, 334 Mont. 474, 149 P.3d 549, when we stated:

> [A] persistent felony offender designation is not itself a separate crime carrying a separate sentence, but is a procedural sentence enhancement required by statute. *See* §§ 46-18-501 and -502, MCA. There is not, therefore, a separate sentence for the felony and a separate sentence for the persistent felony offender charge, but only one sentence pursuant to § 46-18-502, MCA.

¶54 Based on a clear reading of § 46-18-502, MCA, and our prior decisions in *Watson, Fitzpatrick*, and *DeWitt*, we now hold that sentences imposed based on an offender's status as a persistent felony offender *replace* the sentence for the underlying felony. We further hold that when a persistent felony offender is convicted on multiple felony charges, the district court can sentence the offender to the maximum sentence allowable on *each* charge. We overrule our decisions in *Gaither*, *Gunderson* and *Robinson* to the extent that they hold otherwise.

¶55 Accordingly, we hold that, in the instant case, the District Court did not err in sentencing Gunderson to both life imprisonment on the charge of attempted sexual intercourse without consent and a term of 100 years as a persistent felony offender on the burglary charge.

**Issue 2.**

¶56 *Whether there was sufficient evidence to support Gunderson's conviction on the charge of attempted sexual intercourse without consent.*

¶57 Gunderson contends that there was insufficient evidence to establish attempted sexual intercourse without consent in this case because there was no evidence of

18

attempted or intended penetration. He maintains that in order to constitute an attempt of the specific offense of sexual intercourse without consent, there must be attempted penetration or specific evidence that penetration, rather than sexual contact, was intended. The State counters that it sufficiently proved that Gunderson acted upon his intent to rape Randall and that he only failed because of Randall's actions.

*A. Standard of Review*

¶58 Whether sufficient evidence exists to convict a defendant is ultimately an analysis and application of the law to the facts and, as such, is properly reviewed de novo. *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, 160 P.3d 511. The standard of review of sufficiency of the evidence on appeal is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Fish*, 2009 MT 47, ¶ 27, 349 Mont. 286, 204 P.3d 681 (citing *State v. Black,* 2003 MT 376, ¶ 29, 319 Mont. 154, 82 P.3d 926).

*B. Discussion*

¶59 Section 45-4-103(1), MCA (2007), provides: "A person commits the offense of attempt when, with the purpose to commit a specific offense, he does *any* act toward the commission of such offense. [Emphasis added.]" However, not all acts toward the commission of a crime are sufficient. There must be an "overt act" that reaches "far enough towards the accomplishment of the desired result to amount to the commencement of the consummation." *State v. Mahoney*, 264 Mont. 89, 97, 870 P.2d 65, 70 (1994) (quoting *State v. Ribera*, 183 Mont. 1, 11, 597 P.2d 1164, 1170 (1979)); *see*

*also State v. Rains*, 53 Mont. 424, 164 P. 540 (1917). Moreover, "there must be at least some appreciable fragment of the crime committed, and it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter." *Mahoney,* 264 Mont. at 97, 870 P.2d at 70.

¶60 In this case, Gunderson admitted that he watched from a distance as Randall entered her apartment alone at around 2:00 a.m. He also admitted that he knocked on her door and asked to use her telephone as a ruse to get into her apartment. When Randall refused to admit him, he waited until she had turned off the lights and went to sleep before entering her apartment unlawfully. Once inside the apartment, Gunderson locked the door behind him, removed his shirt and shoes, went to Randall's bedroom, sat down on the bed next to her, touched her on her hip and leg, and tried to pull off her underwear. Randall testified that she awoke abruptly to someone kissing the back of her neck and pulling at her underwear. She immediately began to scream and struggle, but Gunderson managed to pull one side of her underwear part way down. At one point, Gunderson pinned Randall's forearms to the bed with her wrists near her ears.

¶61 The only reason penetration did not occur in this case is because Randall was able to fight Gunderson off. "It shall not be a defense to a charge of attempt that because of a misapprehension of the circumstances it would have been impossible for the accused to commit the offense attempted." Section 45-4-103(2), MCA (2007). As the State pointed out in its brief on appeal, clearly Gunderson misapprehended Randall's strength and determination to protect herself. Nevertheless, Randall's ability to thwart Gunderson's attempt to rape her did not negate all of the affirmative steps he took to do so. And,

20

contrary to Gunderson's argument that he did not intend to attempt penetration, that is clearly what he intended when he attempted to remove Randall's underwear.

¶62 Accordingly, we hold that there was sufficient evidence to support Gunderson's conviction on the charge of attempted sexual intercourse without consent.

**Issue 3.**

¶63 *Whether Gunderson's trial counsel provided effective assistance.*

¶64 Gunderson contends that his trial counsel provided ineffective assistance because counsel failed to raise an abandonment defense; to request lesser-included-offense jury instructions; to sufficiently investigate; to call requested witnesses; to impeach Randall; to challenge an allegedly biased juror for cause; to object to the imposition of disjunctive mental state jury instructions; and to object to the imposition of 51 parole conditions. Gunderson also contends that the District Court erred in not holding an evidentiary hearing to inquire into Gunderson's allegations of ineffectiveness.

¶65 The State maintains that Gunderson failed to prove any of his ineffective assistance of counsel claims. The State also maintains that an evidentiary hearing was not necessary because the District Court made an adequate inquiry into Gunderson's mid-trial complaints against his counsel.

*A. Standard of Review*

¶66 Ineffective assistance of counsel claims are mixed questions of law and fact that this Court reviews de novo. *State v. Crosley*, 2009 MT 126, ¶ 27, 350 Mont. 223, 206 P.3d 932 (citing *State v. Herrman*, 2003 MT 149, ¶ 18, 316 Mont. 198, 70 P.3d 738).

*B. Discussion*

21

¶67　Both the Sixth Amendment to the United States Constitution and Article II, § 24 of the Montana Constitution guarantee an individual the right to the effective assistance of counsel in all criminal prosecutions. When we review claims of ineffective assistance of counsel, we employ the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Crosley*, ¶ 54 (citing *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095). This test requires that the defendant establish that counsel's performance fell below an objective standard of reasonableness, and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *Crosley*, ¶ 54.

¶68　To prevail on an ineffective assistance of counsel claim, a defendant must satisfy both prongs of the *Strickland* test. *Whitlow v. State*, 2008 MT 140, ¶ 11, 343 Mont. 90, 183 P.3d 861 (citing *Adams v. State*, 2007 MT 35, ¶ 22, 336 Mont. 63, 153 P.3d 601). Thus, if a defendant makes an insufficient showing regarding one prong of the test, there is no need to address the other prong. *Whitlow*, ¶ 11.

¶69　With respect to the first prong of the *Strickland* test, "a reviewing court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and the defendant 'must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " *Whitlow*, ¶ 21 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). With respect to the second prong of the Strickland test, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Crosley*, ¶ 55 (quoting *State v. Harris*, 2001 MT 231, ¶ 19, 306 Mont. 525, 36 P.3d 372).

22

¶70 Before reaching the merits of an ineffective assistance of counsel claim on direct appeal, we must determine whether the allegations are properly before us. *See Hagen v. State*, 1999 MT 8, ¶ 11, 293 Mont. 60, 973 P.2d 233. If the claims are based on facts of record, they must be raised on direct appeal. However, where the claims cannot be documented from the record, those claims must be raised in a petition for postconviction relief. *Hagen*, ¶ 12. We conclude that, in this case, Gunderson has raised both types of claims.

¶71 In general, "[t]he test to determine if an ineffective assistance claim is properly brought on direct appeal is whether the record contains the answer to 'why' counsel took, or failed to take, action in providing a defense." *State v. Upshaw*, 2006 MT 341, ¶ 33, 335 Mont. 162, 153 P.3d 579 (citing *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340). If the record on appeal explains "why," we will then address the issue on appeal. If, however, the claim is based on matters outside the record on appeal, we may refuse to address the issue on appeal and allow the defendant to file a postconviction proceeding where the defendant can develop a record as to "why" counsel acted as alleged, thus allowing the court to determine whether counsel's performance was ineffective or merely a tactical decision. *Kougl*, ¶ 14 (We also pointed out in *Kougl* that it is sometimes unnecessary to ask "why" in the first instance as when counsel is faced with an obligatory, and therefore non-tactical, action. The question then is not "why" but "whether" counsel acted, and if so, if counsel acted adequately.).

¶72 In the case *sub judice*, during an in-chambers conference with the judge, Kelleher responded to Gunderson's complaints that he failed to sufficiently investigate, to call

requested witnesses, and to impeach Randall, by explaining why he had taken or not taken the complained of action. Thus, we conclude that these claims are record based and are properly before us on direct appeal.

¶73 First, Gunderson complained that Kelleher failed to properly investigate and to call requested witnesses when Kelleher failed to locate the taxi driver that Gunderson claimed had driven him to the Crystal Bar on the night of the incident, or the bouncer that allegedly kicked Gunderson out of the bar that night. Gunderson believed the taxi driver's and bouncer's testimony would bolster his credibility. Kelleher responded that he had difficulty with these issues because the dispatch logs for the cab companies did not show any cab being dispatched to the area near Gunderson's residence on the night in question, and the bar did not have a bouncer fitting the description that Gunderson gave.

¶74 Even if Gunderson were able to demonstrate that Kelleher's performance in this regard fell below an objective standard of reasonableness, Gunderson has failed to establish that had Kelleher been able to locate the taxi driver or the bouncer in question, a reasonable probability existed that "the result of the proceeding would have been different." *Crosley*, ¶ 54. Gunderson admitted that he was in Randall's apartment that night, and the DNA evidence taken from the blood on Randall's hand and underneath her fingernails established that Gunderson was the individual that Randall scratched and threw out of her apartment. Whether or not Gunderson took a cab to the Crystal Lounge on the night in question and was kicked out of the bar by the bar's bouncer would not have changed the outcome of this case.

24

¶75  Second, Gunderson complained that Kelleher did not sufficiently cross-examine Randall because he did not impeach her with her prior statement that Gunderson did not successfully remove her underwear.  To that complaint, Kelleher responded:

> We took a statement, my investigator and I took a statement from her, and one of the questions was to the effect, "Did he succeed in pulling off your underwear at all?"  And she said, "No, I made sure it stayed on."  And in my judgment that was not a denial or a contradiction of what she said.  But in Mr. Gunderson's judgment, "I made sure they stayed on, they didn't come off at all" does contradict her description in court – or her demonstration in court of having them pulled down some four inches or so on her hip, and I didn't ask about that on cross-examination.  I felt that line of questioning was de minimis, and it could easily be refuted by stating, which she did, the only reason her underwear didn't come off is because she vigorously resisted the effort to have that come off.

¶76  We conclude here that Gunderson failed to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  *See Whitlow*, ¶ 21.  Accordingly, we find no merit in Gunderson's contentions that trial counsel provided ineffective assistance by failing to sufficiently investigate, to call requested witnesses, or to impeach Randall.

¶77  As to Gunderson's contentions that Kelleher provided ineffective assistance because he failed to raise an abandonment defense; to request lesser-included-offense jury instructions; to challenge an allegedly biased juror for cause; to object to the imposition of disjunctive mental state jury instructions; and to object to the imposition of 51 parole conditions, claims such as these involve "omissions" and are frequently ill-suited for direct appeal.  *State v. Taylor*, 2010 MT 94, ¶ 21, 356 Mont. 167, 231 P.3d 79 (citing *State v. Russell*, 2008 MT 417, ¶ 33, 347 Mont. 301, 198 P.3d 271; *State v. Meyers*, 2007 MT 230, ¶ 10, 339 Mont. 160, 168 P.3d 645).  The record here provides no

25

information on whether Kelleher's omissions were reasonable under the circumstances or due to deficient performance.

¶78    Accordingly, we hold that these claims are best suited for review in a postconviction proceeding and we dismiss these claims without prejudice.

**Issue 4.**

¶79    *Whether Gunderson was entitled to a jury instruction on missing evidence.*

¶80    Gunderson contends that he was entitled to a jury instruction on missing evidence as a matter of due process because the police failed to make reasonable efforts to conduct a rape examination or to collect other physical evidence such as Randall's bedding. Gunderson argues that this Court should reject the rule set forth in *State v. Swanson*, 222 Mont. 357, 360-62, 722 P.2d 1155, 1157-58 (1986), that police officers have no duty to procure evidence on behalf of a defendant, as well as the standard set forth in *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988), that a defendant must show bad faith to prove a due process violation when lost evidence is only potentially exculpatory.

¶81    The State contends that we should decline to consider Gunderson's arguments on this issue because Gunderson has changed his theory on appeal regarding why the court should have given the instruction. The State points out that Gunderson argued in the District Court that the police had a duty to collect Randall's bedding and to insist that she go to the hospital and undergo a rape examination. However, Gunderson now argues on appeal that his proposed instruction should have been given because the police failed to seize Randall's underwear or swab her neck for Gunderson's DNA.

*A. Standard of Review*

26

¶82 We review jury instructions in criminal cases to determine whether "the jury instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Pol*, 2008 MT 352, ¶ 22, 346 Mont. 322, 195 P.3d 807; *State v. Archambault*, 2007 MT 26, ¶¶ 25-27, 336 Mont. 6, 152 P.3d 698. If the instructions are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error. *State v. Nick*, 2009 MT 174, ¶ 8, 350 Mont. 533, 208 P.3d 864.

*B. Discussion*

¶83 In arguing that the District Court erred in failing to give a jury instruction regarding "missing evidence," Gunderson expanded his theory on appeal to argue that the State not only erred in failing to collect the bedding and to conduct a rape examination of Randall, but also that the police should have collected Randall's underwear and swabbed her neck for Gunderson's DNA. Because these latter two arguments were made for the first time on appeal, we will not address them. *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, 78 P.3d 850 (citing *State v. Peterson*, 2002 MT 65, ¶ 24, 309 Mont. 199, 44 P.3d 499).

¶84 As to Gunderson's theory regarding the failure to collect the bedding and to conduct a rape examination of Randall, Gunderson has failed to show how the court's refusal to give his proposed jury instruction on missing evidence prejudicially affected his substantial rights. Gunderson argued that if the police had gathered the sheets from Randall's bed, it would have shown an absence of fighting or resistance on the bed. However, Officer Wichman testified that he did not collect the bedding because he did

27

not see any blood or other physical evidence on the bedding, and because Randall testified that no actual penetration had occurred, thus no bodily fluids would be present on the bedding. Contrary to Gunderson's assertions, assuming the police had collected and tested the bedding, the fact that there was no blood on the bedding would not have proven an absence of fighting or resistance on the bed. It would only prove that there was no blood on the bedding.

¶85 Similarly, Gunderson argued that if Randall had submitted to a full rape examination, the examination would have demonstrated that she had no physical injuries. However, Randall, Officer Wichman and Detective Paharick all testified that Randall did not have any physical injuries, thus a rape examination would not have proven any more exculpatory than Randall's and the officers' testimony.

¶86 Furthermore, this is not a case where the evidence was lost or destroyed while in the State's custody. The State had no knowledge that these items would be important to the defense as Gunderson never requested any of this evidence until trial.

¶87 Because of the clearly non-exculpatory nature of the evidence in this case as demonstrated above, we decline to address Gunderson's arguments that this Court should reject the rule that police officers have no duty to procure evidence on behalf of a defendant, or the standard that a defendant must show bad faith to prove a due process violation when lost evidence is only potentially exculpatory.

¶88 Accordingly, we hold that the District Court did not err in refusing to give Gunderson's jury instruction on missing evidence.

**Issue 5.**

¶89 *Whether the District Court abused its discretion in denying Gunderson's motion for a mistrial after a prospective juror's comments inadvertently indicated that Gunderson had been in jail.*

¶90 Gunderson argues that the District Court erred in denying his motion for a mistrial because the information solicited by the State during voir dire that one of the prospective jurors was a county jailor and was familiar with Gunderson prejudiced Gunderson's right to a fair trial by creating the impression in the jurors' minds that Gunderson must be a trouble maker. The State maintains that the District Court correctly denied Gunderson's motion for a mistrial because the prospective juror's statement that he knew Gunderson was not expressed negatively and did not taint the jury panel.

*A. Standard of Review*

¶91 We review the denial of a motion for a mistrial to determine whether the district court abused its discretion. *State v. Steele*, 2004 MT 275, ¶ 15, 323 Mont. 204, 99 P.3d 210.

*B. Discussion*

¶92 During voir dire, the prosecutor asked whether any of the jurors knew Kelleher, Gunderson's defense counsel. Juror Thorson raised his hand, and the following exchange occurred:

> MS. McKITTRICK [the prosecutor]: Mr. Thorson. I see you raising your hand. How do you know him?
> MR. THORSON: I work at the Yellowstone County Detention Facility. He comes in and sees a lot of clients.
> MS. McKITTRICK: Are you personal friends, going out to dinner, things like that with Mr. Kelleher?
> MR. THORSON: No.

29

MS. McKITTRICK: Do you think your knowledge of Mr. Kelleher or your friendship with him would affect your ability to sit on this case and decide the case fairly and impartially?

MR. THORSON: No.

MS. McKITTRICK: I guess go here [sic]. Bring up the fact that you are a Yellowstone County detention officer. Are you familiar with Mr. Gunderson?

MR. THORSON: Yes, I am.

MS. McKITTRICK: And would that knowledge of Mr. Gunderson affect you at all to sit on this case?

MR. THORSON: No.

MS. McKITTRICK: And I imagine that when I go through a list of Billings Police Department officers, you're going to recognize many of them. Maybe we could talk about that more at that point in time.

¶93 Thorson never stated that he knew Gunderson because Gunderson had been incarcerated, and Thorson's answers did not reveal anything negative about Gunderson or create any bias towards Gunderson. In fact, Thorson specifically stated that knowing Gunderson did not in any way affect his ability to be fair and impartial.

¶94 Here, Gunderson has failed to show how the District Court may have abused its discretion in denying his motion for a mistrial. Gunderson himself volunteered during his testimony that he had been in jail for seven months awaiting trial in this matter. Moreover, most prospective jurors are aware that a defendant charged with a crime may have spent some time in jail.

¶95 Accordingly, we hold that the District Court did not abuse its discretion in denying Gunderson's motion for a mistrial.

**Issue 6.**

¶96 *Whether the District Court erred when it failed to remove a prospective juror for cause.*

30

¶97　During voir dire, one juror stated that she would "probably have more of a bias that [Gunderson] is [guilty] simply because he's charged." Kelleher questioned this juror at length regarding her statement and she eventually indicated that she thought she could be fair. Kelleher did not challenge this juror for cause and, instead, removed her with a preemptory challenge.

¶98　On appeal, Gunderson argues for the first time that the District Court should have removed this juror for cause because she indicated a bias against him. Since Gunderson did not raise this issue in the trial court, he now asserts that we should invoke the common law plain error doctrine to review this alleged error.

¶99　This Court generally will not address issues raised for the first time on appeal. *State v. Longfellow*, 2008 MT 343, ¶ 19, 346 Mont. 286, 194 P.3d 694. However, when criminal defendants invoke their fundamental rights, we may choose to review a claim under the common law plain error doctrine "where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79 (citing *State v. Jackson*, 2009 MT 427, ¶ 42, 354 Mont. 63, 221 P.3d 1213, *cert. denied*, ___ U.S. ___, ___ S. Ct. ___, 176 L.Ed.2d 1197 (2010)). When a defendant raises the plain error doctrine to request review of issues that were not objected to at the district court level, this Court's review is discretionary. *State v. Gray*, 2004 MT 347, ¶ 13, 324 Mont. 334, 102 P.3d 1255 (citing *State v. Daniels*, 2003 MT 247, ¶ 20, 317 Mont. 331, 77 P.3d 224). Moreover, we have repeatedly stated that we will use plain error review sparingly

on a case-by-case basis. *State v. Hayden*, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091 (citing *State v. Rosling*, 2008 MT 62, ¶ 77, 342 Mont. 1, 180 P.3d 1102).

¶100 The plain error doctrine establishes a two-part test, with the burden on the criminal defendant to meet both parts of that test. *State v. Whipple*, 2001 MT 16, ¶ 32, 304 Mont. 118, 19 P.3d 228. Under this test, we ask two questions: (1) does the alleged error implicate a fundamental right; and (2) would failure to review the alleged error result in one of the consequences mentioned above. *Taylor*, ¶ 14. Furthermore, a mere assertion that constitutional rights are implicated or that failure to review the claimed error may result in a manifest miscarriage of justice is insufficient to implicate the plain error doctrine. *Whipple*, ¶ 34.

¶101 Here, Gunderson failed to meet his burden to show that plain error review is appropriate in this case, and we are not "firmly convinced" that failing to address the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process.

¶102 Accordingly, we decline to apply the plain error doctrine to review Gunderson's claim that the District Court erred when it failed to remove a prospective juror for cause.

**Issue 8.**

¶103 *Whether the District Court erred in instructing the jury on the definitions of "purposely" and "knowingly."*

¶104 Gunderson contends that the District Court erred when it gave the jury disjunctive definitions of "purposely" and "knowingly" that defined the terms as relating either to

conduct or to result. Gunderson did not object to the court's instructions at the time, and he now argues that we should invoke the common law plain error doctrine to review this alleged error.

¶105 Once again Gunderson failed to meet his burden to show that plain error review is appropriate. As we stated in the previous issue, a mere assertion that constitutional rights are implicated or that failure to review the claimed error may result in a manifest miscarriage of justice is not sufficient to invoke the plain error doctrine. *Whipple*, ¶ 34.

¶106 Accordingly, we decline to apply the plain error doctrine to review Gunderson's claim that the District Court erred in instructing the jury on the definitions of "purposely" and "knowingly."

**Issue 9.**

¶107 *Whether the District Court erred in imposing 51 conditions as part of Gunderson's sentence in the event he is ever released to the community.*

¶108 In sentencing Gunderson, the District Court remarked that it had never seen a defendant more deserving of a life sentence than Gunderson, hence the court made it quite clear that it never wanted Gunderson to be released from prison. Nevertheless, the court imposed the conditions recommended in the PSI should any portion of Gunderson's sentence be suspended.

¶109 On appeal, Gunderson contends that the District Court imposed an illegal sentence when it imposed 51 conditions on him. The State concedes that for all practical purposes the conditions imposed on Gunderson amount to conditions of parole, and with the exception of the conditions specifically authorized by statute, the court did not have the

33

authority to impose the conditions because no portion of Gunderson's sentence was suspended. *State v. Burch*, 2008 MT 118, ¶ 36, 342 Mont. 499, 182 P.3d 66.

¶110 Accordingly, we hold that the District Court erred in imposing on Gunderson those conditions not authorized by statute, and we remand to the District Court to strike the unauthorized conditions.

¶111 Affirmed in part, reversed in part and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS