DA 11-0559

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 300

STATE OF MONTANA,

      Plaintiff and Appellant,

  v.

DELAINE MINNIE FITZPATRICK
and MALISA LYNN FITZPATRICK,

      Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Twelfth Judicial District,<br>In and For the County of Hill, Cause Nos. DC 10-096 and DC 10-097<br>Honorable Julie Macek, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

            Steve Bullock, Montana Attorney General; Tammy A. Hinderman
            (argued), Assistant Attorney General, Helena, Montana

            Chad Parker, Assistant Attorney General, Special Deputy County Attorney
            for Hill County, Helena, Montana

      For Appellees:

            Jeremy S. Yellin (argued), Attorney at Law, Havre, Montana
            Marta N. Farmer Yellin (argued), Attorney at Law, Livingston, Montana

| | | |
|---|---:|---|
| | Argued: | September 21, 2012 |
| | Submitted: | September 25, 2012 |
| | Decided: | December 20, 2012 |

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      The State of Montana appeals from the order of the Twelfth Judicial District Court dismissing all charges against Delaine Fitzpatrick (Delaine) and Malisa Fitzpatrick (Malisa) (collectively, the Fitzpatricks).  We reverse and address the issue:

¶2      *Did the District Court err by granting the Fitzpatricks' motion to dismiss for outrageous government conduct?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      During the summer of 2010, several police informants independently advised Agent Peter Federspiel of the Tri-Agency Safe Trails Task Force that the Fitzpatricks were operating an illicit marijuana business in Havre.  The informants told Agent Federspiel that the Fitzpatricks were using their medical marijuana business, "Gonja Gardens," as a front to sell greater quantities of marijuana than permitted under the Medical Marijuana Act (the Act).[1]  Based on this information, Agent Federspiel applied for a search warrant authorizing Agent Brad Gremaux of the Division of Criminal Investigation to set up undercover buys of marijuana from the Fitzpatricks and to electronically monitor and record those transactions.  On July 28, 2010, District Court Judge David Rice issued the search warrant.

¶4      Agent Gremaux was selected as the undercover agent because he already possessed a qualifying patient medical marijuana registry card (patient card).  Under the Act, a person who obtains a patient card from the Department of Health and Human

---

[1] The version of the Act applicable to the Fitzpatricks' conduct is §§ 50-46-101, MCA, to 50-46-210, MCA (2009).

2

Services (the Department) is authorized to "cultivate, manufacture, possess, and transport" marijuana in amounts permitted by the Act. Section 50-46-303(1)(b), MCA (2009). Agent Gremaux had previously obtained a fictitious Montana driver's license in the name of his undercover identity. Using his undercover identity, Agent Gremaux had attended a medical marijuana seminar in Missoula where he completed a form indicating that he needed medical marijuana because he suffered from a "debilitating medical condition." Section 50-46-102(2), MCA. He used his undercover identity in a visit to a Missoula physician, and did not advise the physician that he was applying for a patient card for investigative purposes. The physician signed a form verifying that Agent Gremaux's medical condition qualified him for medical marijuana. Agent Gremaux then completed an application for a patient card, paid the necessary application fee, and sent the materials to the Department. Agent Gremaux did not indicate in his application paperwork that he was applying for the patient card as an undercover agent. The Department issued Agent Gremaux a patient card in the name of his undercover identity.

¶5 Using his undercover identity, Agent Gremaux contacted Delaine Fitzpatrick on July 28, 2010.[2] He offered that he was passing through town, that he had a patient card, and that he was sick. Delaine agreed to meet him in the parking lot of a Havre bar, and to sell him a quarter-ounce of marijuana. When they met, Delaine asked Agent Gremaux for his identification and patient card. Satisfied, Delaine sold Agent Gremaux the marijuana. Before parting, Agent Gremaux and Delaine made plans for future

---

[2] All of Agent Gremaux's conversations with the Fitzpatricks, via telephone and in person, were electronically monitored and recorded pursuant to search warrants issued by Judge Rice. These transcribed recordings provide the factual background for Agent Gremaux's interactions with the Fitzpatricks.

transactions. Delaine provided Agent Gremaux with the phone number of her sister, Malisa, to contact if Delaine was unavailable.

¶6 Over the next two weeks, Agent Gremaux purchased quantities of marijuana from Delaine and Malisa in excess of what was legal under the Act. On August 2, 2010, Agent Gremaux purchased four ounces of marijuana from Delaine for $1,100. On August 18, 2010, Malisa agreed to sell Agent Gremaux another four ounces. When Agent Gremaux attempted to arrange a purchase of more than four ounces, Malisa told him that she would be unable to sell him more than four ounces until he had "cards" underneath him to "cover" the Fitzpatricks and himself.

¶7 On August 19, 2010, Agent Gremaux called Malisa to arrange the pickup of the agreed-to four ounces. They agreed to meet in the parking lot of a Havre grocery store. Law enforcement arrested Malissa on her way to this meeting and Delaine in their home. Following the arrests, Agent Federspiel executed search warrants for the Fitzpatricks' vehicles, their residence, and the garage of a house to which he had followed Malisa on several occasions. The officers retrieved 211.5 ounces of marijuana and marijuana preparations. This exceeded by four times the amount of marijuana the Fitzpatricks were allowed to possess as "caregivers" and "patients" under the Act.[3]

¶8 The State charged Delaine with two counts of criminal distribution of dangerous drugs and one count of criminal possession of dangerous drugs with intent to distribute.

---

[3] Malisa was a registered "caregiver" to 25 patients, and Delaine was a registered "caregiver" to 22 patients. Both were also registered "patients." Under the Act, a caregiver is permitted to possess 1 ounce of usable marijuana per patient, and a patient is permitted to possess one ounce of marijuana. Section 50-46-201(1)(b), MCA (2009). Therefore, as both caregivers and patients, Malisa and Delaine were authorized to possess a total of 49 ounces of marijuana.

Malisa was charged with two counts of criminal distribution of dangerous drugs, one count of criminal distribution of dangerous drugs by accountability, and one count of criminal possession of dangerous drugs with intent to distribute. The Fitzpatricks' cases were later consolidated by stipulation of the parties.

¶9 The Fitzpatricks filed a joint motion to suppress and dismiss. They argued, *inter alia*, that the charges should be dismissed because the State engaged in "outrageous government conduct" by obtaining evidence against them in violation of the Due Process Clause of the federal Constitution. The Fitzpatricks asserted that Agent Gremaux's obtaining of a medical marijuana patient card was outrageous conduct because he lied to the physician about his identity, provided the physician with a fake Montana driver's license, lied about needing medical marijuana to treat physical symptoms, and lied on his application to the Department to obtain his patient card. Because these actions would be illegal if committed by an ordinary citizen, the Fitzpatricks argued it was outrageous and violated their due process rights. The Fitzpatricks relied solely on federal law, making no argument that the conduct violated the Montana Constitution.

¶10 The District Court conducted a hearing and orally granted the Fitzpatricks' motion to dismiss. The District Court found the process by which Agent Gremaux had obtained his medical marijuana patient card "somewhat shocking" in that he broke numerous laws "under the banner of law enforcement." The District Court reasoned that the government should not be allowed to "get right down in the mud of criminal activity" for no other reason than the "ends justify the means." The District Court concluded:

5

[W]hat the state is asserting is that because we thought that there may be a crime being committed we then have the authority to do whatever is necessary in order to prosecute that crime and in order to attempt to get the information necessary to charge them with a crime, and although I certainly would agree that undercover operatives have some leeway in regards to having to deal with the criminal elements that they're required to operate within, I do not find any authority for the proposition that in order to do so they are allowed to conduct themselves in a way in which it would be illegal if they were a private citizen, and that's where I think the problem is here, is that if a private citizen did the things that [Agent Gremaux] did here they would be susceptible to being charged with criminal offenses. And I find nothing in the law that indicates that there is an exception for law enforcement to comply with the law, so that's the basis for the Court's ruling here.

¶11 The State appeals.

## STANDARD OF REVIEW

¶12 A motion to dismiss in a criminal case "based on outrageous government conduct is a question of law reviewed *de novo*." *U.S. v. Citro*, 842 F.2d 1149, 1152 (9th Cir. 1988); *accord State v. Howard*, 2008 MT 173, ¶ 8, 343 Mont. 378, 184 P.3d 344.

## DISCUSSION

¶13 *Did the District Court err by granting the Fitzpatricks' motion to dismiss for outrageous government conduct?*

¶14 The State argues that the dismissal of the charges was error because federal courts have concluded that limited government involvement in criminal activities is both constitutionally acceptable and necessary, particularly during the investigation of illicit transactions such as those involved here. Because the "outrageous government conduct" defense and the "entrapment" defense share origins and are often discussed together, an analysis requires reference to both.

6

¶15   These defenses have their jurisprudential roots in the United States Supreme Court case of *Sorrells v. U.S.*, 287 U.S. 435, 53 S. Ct. 210 (1932), in which the Court first recognized the entrapment defense. *Sorrells*, 287 U.S. at 443, 53 S. Ct. at 213. Prior to *Sorrells*, there had been a "deep split of authority" within the lower courts regarding whether entrapment was a "subjective (looking to the defendant's predisposition)" defense or "objective (looking to the government's conduct)" defense. *U.S. v. Tucker*, 28 F.3d 1420, 1422 (6th Cir. 1994). The Court chose the subjective approach, under which a defendant who "seeks acquittal by reason of entrapment . . . cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Sorrells*, 287 U.S. at 451, 53 S. Ct. at 216. Whether the defendant is predisposed to commit the crime was a question of fact for the jury. *Sorrells*, 287 U.S. at 452, 53 S. Ct. at 216. The Court reasoned that the legal foundation for the entrapment defense was statutory construction: Congress did not intend for criminal statutes to apply to conduct that had been instigated by government officials to lure innocent persons into committing crimes. *Sorrells*, 287 U.S. at 448, 53 S. Ct. at 215.

¶16   Justice Roberts concurred with the result in *Sorrells* but wrote separately to express his view that the objective approach should be adopted—would the government's conduct have induced a reasonable person to commit the crime. *Sorrells*, 287 U.S. at 453, 53 S. Ct. at 217 (Roberts, J., concurring).[4] To Justice Roberts, the subjective approach was under-inclusive because the "true foundation" of the entrapment doctrine was not only to protect innocent persons from being ensnared in government traps, but

---

[4] Justices Brandeis and Stone joined Justice Roberts' concurrence.

also to protect the "purity of government and its processes." *Sorrells*, 287 U.S. at 455, 53 S. Ct. at 217. Under this view, the courts—not juries—would dismiss criminal charges that the government obtained through the disregard of statutory or common-law rules: "The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law." *Sorrells*, 287 U.S. at 457, 53 S. Ct. at 218. Over the ensuing decades, a robust debate regarding the subjective approach versus the objective approach to entrapment continued in a series of Supreme Court cases. In each case, narrow majorities carried the day for the continued use of the subjective entrapment approach. *See Sherman v. U.S.*, 356 U.S. 369, 372, 78 S. Ct. 819, 822 (1958) ("To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."); *see also U.S. v. Russell*, 411 U.S. 423, 433 93 S. Ct. 1637, 1643 (1973); *Hampton v. U.S.*, 425 U.S. 484, 490, 96 S. Ct. 1646, 1650 (1976) (plurality). Eventually, the subjective entrapment analysis was endorsed by all of the Justices. *Jacobson v. U.S.*, 503 U.S. 540, 112 S. Ct. 1535 (1992).

¶17    While the objective entrapment analysis espoused by Justice Roberts in *Sorrells* never gained the Court's favor, the outrageous government conduct defense arose to check excessive government tactics. Like the theory of objective entrapment that was rejected by the Court, the outrageous government conduct defense focused on the *government's conduct* in obtaining the evidence against the defendant, as opposed to the defendant's predisposition to commit the crime. *Rochin v. Cal.*, 342 U.S. 165, 172, 72 S.

8

Ct. 205, 209-10 (1952); *Russell*, 411 U.S. at 431-32, 93 S. Ct. at 1643. The defense made its first appearance in *Rochin*. There, three deputy sheriffs made a warrantless entry into the defendant's house, assaulted the defendant, and later ordered a doctor to pump his stomach in an attempt to retrieve two morphine pills that he had swallowed in their presence. *Rochin*, 342 U.S. at 166-67, 72 S. Ct. at 207. After reasoning that judicial review of law enforcement tactics was reserved only for practices that violate " 'those personal immunities' " that are " 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' " *Rochin*, 342 U.S. at 169, 72 S. Ct. at 208 (quoting *Snyder v. Mass.*, 291 U.S. 97, 105, 54 S. Ct. 330, 332 (1934)), the *Rochin* Court held that the deputy sheriffs' actions had crossed that line:

> [W]e are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the [defendant], the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceedings by agents of the government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

*Rochin*, 342 U.S. at 172, 72 S. Ct. at 210. The Court reversed the defendant's conviction as a matter of law, reasoning, like Justice Robert's objective entrapment analysis in *Sorrells*, that the determination of whether the government's conduct violated due process was for the courts, not juries. *Rochin*, 342 U.S. at 174, 72 S. Ct. at 210.

¶18 Although the Court has not applied *Rochin*'s shocks-the-conscience test to reverse a conviction in the succeeding 60 years, neither has the test been overruled. In *Russell*,

9

the Court rejected the defendant's entrapment argument and analyzed, under the *Rochin* test, the undercover federal agent's conduct of providing the chemical necessary for the defendant's production of methamphetamine. *Russell*, 411 U.S. at 432, 93 S. Ct. at 1643. The Court concluded that the defense was inapplicable under the facts of the case, but in dicta stated the door was open to future challenges based thereon:

> While we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165 (1952), the instant case is distinctly not of that breed. [The undercover federal agent's] contribution of propanone to the criminal enterprise in process was scarcely objectionable. . . . The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the *Due Process Clause* . . . .

*Russell*, 411 U.S. at 431-32, 93 S. Ct. at 1643 (citation omitted). The Court reasoned that the undercover agent's actions were "scarcely objectionable" because they were likely the only way for law enforcement to infiltrate the on-going methamphetamine operation:

> The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses, law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice."

10

*Russell*, 411 U.S. at 432, 93 S. Ct. at 1643 (citation omitted). The Court thus illustrated that the determination of whether conduct is "outrageous" is analyzed within the context of the particular illegal activity under investigation.

¶19    Three years later, the Court revisited the outrageous government conduct defense in *Hampton*. The defendant was convicted of selling heroin to undercover DEA agents, even though a government informant supplied the heroin to the defendant. *Hampton*, 425 U.S. at 485-87. Citing *Russell*'s "someday" dicta, the defendant argued that the government's actions in both supplying him with the heroin and purchasing it were so outrageous that it violated his right to due process. *Hampton*, 484 U.S. at 489-90, 96 S. Ct. at 1649-50. The decision produced three separate opinions, with no opinion receiving the vote of a majority of the Justices. Writing for a three-justice plurality, then-Justice Rehnquist proffered that the defense of entrapment was available only if (1) the defendant was not predisposed to commit the crime, and (2) the defendant did not encourage the government's illegal actions. *Hampton*, 425 U.S. at 489, 96 S. Ct. at 1649. Likewise, the defense of outrageous government conduct was not available unless these conditions were met. *Hampton*, 425 U.S. at 489, 96 S. Ct. at 1649 ("The remedy of the criminal defendant with respect to the acts of Government agents, which, far from being resisted, are encouraged by him, lies *solely* in the defense of entrapment. But, as noted, [the defendant's] conceded predisposition rendered this defense unavailable to him.") (Emphasis added). Analyzing the defendant's outrageous government conduct defense, Justice Rehnquist wrote that the trickery used by the undercover agents to sell heroin to

11

the defendant and to later purchase the same heroin from him did not implicate the defendant's legal rights:

> The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the Defendant. . . . If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.

*Hampton*, 425 U.S. at 490, 96 S. Ct. at 1650. Justice Powell concurred but wrote separately to voice his disagreement with Justice Rehnquist's bright-lined rule that barred defendants from asserting an outrageous government conduct defense if they were predisposed to commit the crime and encouraged the government's illegal conduct. *Hampton*, 425 U.S. at 492-93, 96 S. Ct. at 1651 (Powell, J., concurring).[5] To Justice Powell, such a rule was premature, given that the Court had previously only had the opportunity to address government involvement in contraband offenses. *Hampton*, 425 U.S. at 493, 96 S. Ct. at 1651. With such a narrow survey of cases, he was unwilling to foreclose future scenarios where due process could be implicated by egregious government conduct regardless of the defendant's predisposition or the level of the government involvement in the crime:

> "There is certainly a constitutional limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction."

---

[5] Justice Blackmun joined Justice Powell's concurrence.

*Hampton*, 425 U.S. at 492 & n. 4, 96 S. Ct. at 1651-52 (quoting *U.S. v. Archer*, 486 F.2d 670, 676-77 (2d Cir. 1973) (Friendly, J.) (brackets omitted)). Justice Powell emphasized that government conduct rising to the level of a due process violation would be "rare" in the context of contraband offenses: "Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement." *Hampton*, 425 U.S. at 495 & n. 7, 96 S. Ct. at 1653. Justice Brennan dissented.[6] He advocated the rebirth of objective entrapment and sided with Justice Powell's concurrence that the outrageous government conduct defense should be permitted regardless of the defendant's predisposition. *Hampton*, 425 U.S. at 496-97, 96 S. Ct. at 1653 (Brennan, J., dissenting).

¶20     Thus, while *Hampton* had no majority opinion, five members of the Court—two in Justice Powell's concurrence and three in Justice Brennan's dissent—approved the continued viability of the "outrageous government conduct" defense. *See Hampton*, 425 U.S. at 493-94, 96 S. Ct. at 1652-53 (Powell & Blackmun, JJ., concurring in judgment); *Hampton*, 425 U.S. at 497, 96 S. Ct. at 1653-64 (Brennan, Stewart, & Marshall, JJ., dissenting). The defense has thus survived in the jurisprudence of the United States

---

[6] Justices Stewart and Marshall joined the dissent. Justice Stevens did not participate.

13

Supreme Court on this tenuous footing, and the lower courts have been called upon to flesh out what actions constitute "outrageous government conduct."[7]

¶21    Drawing upon *Rochin*, *Russell*, and Justice Powell's concurrence in *Hampton*, the Ninth Circuit Court of Appeals formulated an outrageous government conduct defense that "[p]rosecution is barred for violation of due process only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *U.S. v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993) (internal quotation marks and brackets omitted).    That court has explained that "grossly shocking" and "outrageous" is an "extremely high standard,"[8] requiring, at a minimum, that the government's involvement: (1) "be *malum in se*" or (2) "amount to the engineering and

---

[7] Two Circuit Courts of Appeal have rejected the outrageous government conduct defense altogether. *See U.S. v. Tucker*, 28 F.3d 1420, 1428 (6th Cir. 1994) (reasoning that outrageous government conduct analysis violates separation of powers because it allows the Judicial Branch to infringe on the Executive Branch's zone of responsibility); *U.S. v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) (reasoning that "outrageousness" is a non-judiciable political question that invites judges not to apply legal rules but to instead determine whether the "government is violating the community's moral standards."). Another Circuit has openly called for its demise. *See U.S. v. Santana*, 6 F.3d 1, 3-4 (1st Cir. 1991) (outrageous government conduct defense is the "deathbed child of objective entrapment, a doctrine long since discarded in the federal courts"). Further, the United States Supreme Court has commented that because *Rochin* was decided before *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961), the issue would now be "treated under the Fourth Amendment, albeit with the same result." *Co. of Sacramento v. Lewis*, 523 U.S. 833, 849 n. 9, 118 S. Ct. 1708, 1718 n. 9 (1998). However, the majority of the Courts of Appeal, including the Ninth Circuit, continue to recognize the defense. *See e.g. U.S. v. Simpson*, 813 F.2d 1462, 1465 (9th Cir. 1987).

[8] Out of the hundreds of cases in which the defendant asserted the outrageous government conduct defense, "[i]t appears that the defense has only been raised successfully once in the Ninth Circuit, in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)." *U.S. v. Simpson*, 2010 WL 1611483, *6 (D. Ariz. April 20, 2010).

14

direction of the criminal enterprise from start to finish." *U.S. v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991).[9]

¶22 *Malum in se* is defined as a "[c]rime or act that is inherently immoral, such as murder, arson, or rape." *Black's Law Dictionary* 1045 (Bryan A. Garner ed., 9th ed., West 2009). *Malum prohibitum* on the other hand is "[a]n act that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral." *Black's Law Dictionary* at 1045. Our Court and other courts have likewise recognized that there is a "well-recognized" distinction between these types of crimes. *State v. Smith*, 190 P. 107, 112, 57 Mont. 563, 578-79 (1920). In the context of the outrageous government conduct defense, this distinction reflects the reality that *malum in se* crimes such as rape or murder directly affect individuals, whereas *malum prohibitum* crimes generally affect only the administration of public order. *See Archer*, 486 F.2d at 676-77. Drawing the line between *malum in se* and *malum prohibitum* thus attempts to strike a balance between protecting individual citizens from government conduct that injures another and judicial deference to the executive branch to aggressively ferret out crime. *Archer*, 486 F.2d at 677-78.

¶23 Here, Agent Gremaux's conduct of obtaining a fictitious Montana driver's license, visiting a doctor and obtaining a prescription for medical marijuana using his false

---

[9] This disjunctive test is derived primarily from Justice Powell's concurrence in *Hampton*. *See U.S. v. Gonzales*, 539 F.2d 1238, 1239 (9th Cir. 1976) (per curiam). Justice Powell reasoned that courts may have a constitutional duty to dismiss prosecutions when government activities have directly injured the rights of others (*malum in se* conduct) or when the government has engineered and directed a criminal enterprise from start to finish. *Hampton*, 425 U.S. at 493 nn. 3, 4, 6, & 7, 96 S. Ct. at 1652 nn. 3, 4, 6, & 7.

identity and under the pretense of needing medical marijuana for an ailment, and using his fictitious Montana driver's license and the prescription to apply for a patient card from the Department, are *malum prohibitum* offenses.[10] This type of law enforcement subterfuge does not constitute "inherently immoral" crimes such as rape or murder; rather, these offenses committed by Agent Gremaux are crimes "merely" because they are prohibited by statute. Because Agent Gremaux's undercover involvement did not include *malum in se* acts, the defense of outrageous government conduct is not implicated under Ninth Circuit precedent. *See Smith*, 924 F.2d at 897. A survey of Ninth Circuit precedent confirms our conclusion. The Ninth Circuit has upheld against due process challenges the following illegal conduct by law enforcement: the use of false identities by undercover agents, *Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir. 1986), the introduction of drugs into a prison to identify a distribution network, *U.S. v. Wiley*, 794 F.2d 514, 515 (9th Cir. 1986), and the commission of equally serious offenses by an undercover agent as part of the investigation, *U.S. v. Stenberg*, 803 F.2d 422, 430-31 (9th Cir. 1986); *accord U.S. v. Hugs*, 109 F.3d 1375, 1379 (9th Cir. 1997).

¶24 Further, Agent Gremaux's *malum prohibitum* conduct did not injure the Fitzpatricks. While his conduct technically violated Montana statutes, these crimes did not affect the Fitzpatricks' due process rights. In *Rivera v. Wyoming*, 846 P.2d 1, 7 (Wyo. 1993), the Wyoming Supreme Court held that an undercover agent's failure to

---

[10] The District Court named the following crimes that Agent Gremaux committed in obtaining his fictitious driver's license and patient card: "Tampering with public records or information" § 45-2-207, "False Swearing" § 45-2-202, "Official Misconduct" § 45-7-401, "Fraudulently obtaining dangerous drugs" § 45-9-104, and "Unlawful use of license or identification card" § 61-5-302.

register 100 pounds of marijuana—as required by Wyoming law—did not implicate the defendant's legal rights. While recognizing the officer's actions were technically illegal, the court reasoned that they did not infringe on any of the defendant's protected rights. *Rivera*, 846 P.2d at 7; *accord People v. Welsey*, 224 Cal. App. 3d 1130, 1141, 274 Cal. Rptr. 326 (1990) ("[W]e fail to perceive in what manner the source of the cocaine, or [the undercover officer's] illegal possession of the contraband would have affected defendant's criminal conduct or had a bearing on his due process rights."). The United States Supreme Court has similarly voiced support for the requirement that a defendant may only challenge actions which infringe on his rights. *See U.S. v. Payner*, 447 U.S. 727, 737 n. 9, 100 S. Ct. 2439, 2447 n. 9 (1980) (rejecting defendant's argument that the government's unconstitutional search of third-party's briefcase amounted to outrageous government conduct because "the fact remains that 'the limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant*' ") (quoting *Hampton*, 425 U.S. at 490, 96 S. Ct. at 1650 (plurality opinion) (emphasis in *Payner*)); *accord U.S. v. Valdovinos-Valdovinos*, 743 F.2d 1436, 1437 (9th Cir. 1984). Under this reasoning, Agent Gremaux's violations of Montana law in obtaining his medical patient card do not implicate—let alone violate—a right individual to the Fitzpatricks.

¶25 The Ninth Circuit case of *U.S. v. Hugs* illustrates this point. A Montana undercover wildlife agent posed as a "semiretired contractor interested in hunting, fishing, and purchasing trophy big game heads" and hired the defendants as guides to hunt on the Crow Reservation. *Hugs*, 109 F.3d at 1377. During two guided hunting

trips, the undercover agent illegally killed game out of season and illegally brought alcoholic beverages onto the reservation. *Hugs*, 109 F.3d at 1379. The defendants were prosecuted for shooting at, killing, and purchasing eagles in violation of the Bald and Golden Eagle Protection Act. *Hugs*, 109 F.3d at 1377. The defendants moved to dismiss the prosecution, alleging that the undercover agent committed "outrageous conduct" during his investigation. *Hugs*, 109 F.3d at 1377. The District Court denied the motion, and the Ninth Circuit affirmed. *Hugs*, 109 F.3d at 1377. The Ninth Circuit rejected the defendants' argument because the undercover agent's actions of killing animals did not "impair[] their due process rights." *Hugs*, 109 F.3d at 1379. As in *Russell* and Justice Powell's *Hampton* concurrence, which reasoned that common sense required that law enforcement enjoy greater leeway in infiltrating and investigating secretive groups such as those involved in drug enterprises, the Ninth Circuit reasoned that the undercover agent's conduct was necessary to keep his cover as a supposed hunter. *Hugs*, 109 F.3d at 1379 ("Agent Long testified that he occasionally shot an animal, but only when necessary to maintain his credibility as a supposed hunter . . . .").

¶26 Agent Gremaux's conduct was necessary to infiltrate the Fitzpatricks' illegal marijuana enterprise and to maintain his credibility as a medical marijuana patient. From May through July of 2010, police informants reported to Agent Federspiel that the Fitzpatricks, under the guise of operating a legal medical marijuana operation, were selling marijuana in amounts exceeding that permitted by law. It was logical and sensible for Agent Federspiel to deduce that the Fitzpatricks were selling only to individuals with patient cards in order to shield themselves from criminal liability. When Agent Gremaux

18

met Delaine for the first time in the bar parking lot, she inspected his Montana driver's license and his patient card. The process through which he obtained his medical marijuana card was technically illegal, but it was the type of illegal conduct necessary for him to infiltrate the criminal enterprise as approved by the Supreme Court in *Russell* and *Hampton*, and by the Ninth Circuit in *Hugs*, *Shaw*, *Wiley*, and *Stenberg*.

¶27 The second circumstance for which the Ninth Circuit has held that a defendant can raise the outrageous government conduct defense is when the government's involvement amounts "to the engineering and direction of the criminal enterprise from start to finish." *Smith*, 924 F.2d at 897. The Ninth Circuit has dismissed charges under this standard only once. *See Greene v. U.S.*, 454 F.2d 783 (9th Cir. 1971). Because *Greene* is clearly distinguishable from the facts at hand, it is of no help to the Fitzpatricks.

¶28 In *Greene*, an undercover federal agent convinced two defendants who had recently been charged with manufacturing "bootleg" whiskey to restart their operation. *Greene*, 454 F.2d at 785. The agent convinced the defendants that he worked for a "syndicate," and pressured the defendants into restarting operations over an eight month period. *Greene*, 454 F.2d at 785. In "an effort to spur production" the agent also made what the court construed as a "veiled threat" that whiskey needed to be made for the syndicate because "the boss [was] on [his] back." *Greene*, 454 F.2d at 784-85, 787. The agent became a "substantial" partner in the bootlegging operation, offering to provide the defendants with a "still, a still site, still equipment, and an operator" and actually providing two thousand pounds of sugar. *Greene*, 454 F.2d at 786. Before being arrested, the defendants produced whiskey for over a year and a half, all of which was

19

sold to the agent who paid for it with government funds. *Greene*, 454 F.2d at 787. The Ninth Circuit dismissed the charges, asserting that it did "not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Greene*, 454 F.2d at 787. The Ninth Circuit explained that the circumstances of the government's total immersion in the bootlegging operation "from beginning to end" was "repugnant to American criminal justice." *Greene*, 454 F.2d at 786-87. Particularly troubling to the court was the fact that the undercover operation only served to punish the same individuals who were already facing identical bootlegging charges:

> [T]he Government, through its [undercover agent], did not simply attach itself to an on-going bootlegging operation for the purpose of closing it down and prosecuting the operators. Any continuing operation had been terminated with the [defendants' first arrest]. We think, rather, that the procedure followed by [the undercover agent] in this case helped first to reestablish, and then to sustain, criminal operations which had ceased with the first convictions.

*Greene*, 454 F.2d at 787.

¶29    *Greene* is not helpful to the Fitzpatricks because none of the circumstances are present here.[11] Agent Gremaux did not pressure the Fitzpatricks into starting up the illegal part of their marijuana operation. Indeed, the reports that Gonja Gardens was operating as a front for on-going illegal sales prompted the investigation. Further, Agent Gremaux never became a partner, let alone a "substantial" partner, in the illegal

---

[11] The Fitzpatricks invite us to adopt the four factor test articulated by the federal district court in *U.S. v. Batres-Santolino*, 521 F. Supp. 744 (N.D. Cal. 1981) to determine if the government's over-involvement in a criminal enterprise crosses the line articulated in *Greene*. To the extent that *Batres-Santolino* articulates such a test, we decline their invitation and opt instead to use *Greene* itself, as it is more authoritative and provides clearer reasoning.

20

operations of Gonja Gardens—he did not provide any help to the Fitzpatricks. Unlike *Greene*, Agent Gremaux was not Gonja Gardens' only client. Finally, unlike the punitive actions of the government in seeking to reactivate an illegal operation to punish the defendants, who had recently been charged, the Fitzpatricks had not been shut down prior to their arrests. Agent Gremaux was collecting evidence to shut down Gonja Gardens for the first time. There are no facts to establish that the government's investigation of Gonja Gardens constituted "engineering and direction of the criminal enterprise from start to finish." *Smith*, 924 F.2d at 897.

¶30 Because Agent Gremaux's conduct was not either "*malum in se* or engineering and direction of the criminal enterprise from start to finish," *Smith*, 924 F.2d at 897, "[t]he law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the *Due Process Clause* . . . ." *Russell*, 411 U.S. at 432, 93 S. Ct. at 1643 (citation omitted). The District Court thus erred in dismissing the Fitzpatricks' charges based on the outrageous government conduct defense.

¶31 We reverse the dismissal of the charges and remand for further proceedings.


/S/ JIM RICE

We Concur:


/S/ PATRICIA COTTER
/S/ JAMES C. NELSON

21

/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS

/S/ INGRID G. GUSTAFSON
District Court Judge Ingrid G. Gustafson
sitting for Chief Justice Mike McGrath