FILED

01/07/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0339

DA 22-0339

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 4N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

MICHELE LARA LATTER,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Sixteenth Judicial District,
In and For the County of Custer, Cause No. DC-2021-60
Honorable Michael B. Hayworth, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy Hinderman, Appellate Defender, Deborah S. Smith, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Thad Nathan Tudor,
Assistant Attorney General, Helena, Montana

          Shawn Quinlan, Interim Custer County Attorney, Miles City,
Montana

Submitted on Briefs:  October 30, 2024
Decided:  January 7, 2025

Filed:

_____
Clerk

Justice McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Michele Lara Latter (Latter) appeals her conviction for criminal mischief entered in the Sixteenth Judicial District Court, Custer County. The District Court is affirmed.

1. Arrest and Flood

¶3 This appeal arises from a 2022 jury trial for criminal mischief involving post-arrest damage to the Custer County Detention Center. Latter was arrested for theft of a semi-truck and criminal mischief involving the truck on October 1, 2021. The arresting sheriff's deputy stated that Latter became angry during transport and remained dysregulated when she arrived at the jail. During booking, the arresting deputy asked Latter about any medical or mental health conditions; she responded by cursing at him. She indicated that she did not have any medical conditions but that she preferred a diabetic diet. When asked if she took medications or required specialized medical equipment, she responded, "Um, yeah, I do, but nobody gives a [expletive], because last time I [expletive] requested it, everybody else told me to go to [expletive] hell and [expletives] and [expletive] die. So, maybe I should just say no and I'm [expletive] fine and [expletive] dandy." Sometime later, staff

2

completed a medical alert form for Latter; Latter indicated that she had had her heart restarted "in the past." Also during booking, Latter attempted to remove her jewelry, but was unable to remove rings from both of her ring fingers apparently due to swelling. Officers allowed her to keep her rings in an attempt to de-escalate her behavior and because they did not want to damage her property by cutting them off.

¶4 Latter remained agitated following booking and into the next day. She remained in a holding cell because she was "not suitable for any placement in population." The on-duty officer during the day of October 2 testified that despite their efforts to de-escalate, Latter was "yelling and screaming, donkey kicking the doors, punching windows, [and] making threats towards staff and others." By the evening of October 2, officers were considering placing Latter in a restraint chair due to her behavior. She kicked her cell door over one hundred times in less than five minutes while demanding a phone call. While discussing whether to restrain her, the jail fire alarm went off. Video from Latter's cell shows her covering up the camera with wet toilet paper before presumably damaging and triggering the fire sprinkler, which caused a flood resulting in over $1,500 of damage. The fire department arrived to help and officers assisted in cleaning up water.

¶5 Officers then moved Latter to the adjacent intoxilyzer room, which had a bench for inmates to be "parked" and attached to the wall with restraints. Assuming that Latter had used her rings to activate the sprinkler system, officers pinned Latter down by her legs and

3

shoulders, with her torso forward on her knees and her hands still cuffed to the wall above, forcibly removing her rings. Latter screamed and writhed in apparent pain.

2. Pre-Trial Disclosures and Motions

¶6 On November 8, 2021, Latter wrote a letter to the District Court, in part explaining that

> staff that booked me . . . may have looked over the fact I told him of my heart condition and having had two EKG's [sic] in the past year that may have been overlooked by staff, namingly [sic] [officer who was on duty before Latter triggered the alarm], when I alerted him to get some aspirin or tylonol [sic] as I was having symptoms of dizziness, lightheadedness, tingling of limbs, rapid heartbeat/pounding heartbeat coupled with panic/anxiety. I was ignored and resorted to tampering with the Firetrol system in case I did faint or stop breathing at least the fire dept. would be there. I was in fear for my life.

An omnibus hearing was held on November 29, 2021, where the parties agreed to a three-day trial beginning March 9, 2022. Latter's original counsel waived a compulsion defense. The omnibus order stated that Latter's expert disclosures were due no later than 45 days before trial—January 24, 2022.

¶7 Latter's replacement counsel failed to meet the disclosure deadlines. On February 15, 2022, one day after the pretrial conference, Latter provided notice of her witnesses, including expert witness Forrest Hirsch, NP-C, a medical provider whom Latter had last seen in April 2021 at Garrison Family Clinic in North Dakota. She also included her medical records from Garrison Family Clinic as an exhibit. On March 1, the State moved to exclude Latter's expert witnesses and related exhibits for untimely disclosure. On March 2, Latter moved for the District Court to allow the affirmative defense of

4

compulsion and supporting evidence, asserting that there was good cause for such a late strategic change because the State had failed to disclose certain supporting evidence until March 1. The State opposed this motion.

¶8 On March 9, the morning of trial, the District Court held a hearing on the admissibility of Latter's experts and the compulsion defense.[1] The District Court explained that it would allow the compulsion defense because Latter's letters foreshadowed the use of medical necessity "so it wasn't a complete surprise." It assured that Latter understood the evidentiary implications of the defense, and Latter indicated her understanding. Regarding Hirsch's proposed expert testimony, the State argued that because of the late disclosure, it had not had sufficient time to prepare for cross-examination or rebuttal testimony. It was also unclear whether the appropriate medical release had been provided in order for Hirsch to speak with the State. Latter's counsel explained that he was "not intending on calling Mr. Hirsch as an expert" but rather as a lay witness. The District Court asked, "And as a lay witness, period, what is his testimony?" Latter's counsel responded that Hirsch's testimony would be about "his relationship with Ms. Latter and the [sic] his understanding about what has happened in the jail." After confirming that Hirsch had not examined Latter on October 1 or 2 and that he had no personal knowledge of the events

---

[1] In a March 4 Summary Order on Defense Motions in Limine/Order Clarifying Scope of Hearing on Motions in Limine, the District Court addressed the admissibility of Latter's above-quoted letter to the Court. It found that allowing Latter's statement in the State's case-in-chief would be unduly prejudicial because Latter would be "locked into pursuing the Compulsion affirmative defense." However, if Latter *chose* to use the compulsion defense and therefore assumed the burden of proving compulsion, the statement would no longer be unduly prejudicial.

and would only be repeating what he was told by Latter or jail staff, the District Court excluded Hirsch. Hirsch was later permitted to testify at sentencing.

3. Trial

¶9     A three-day trial took place from March 9-March 11, 2022. The facts recited here are limited to those relevant to Latter's claim of prosecutorial misconduct. One alleged issue revolves around contradictory testimony regarding the removal of her rings. On direct testimony, multiple officers testified that Officer Crews and Officer Huber were the ones to remove Latter's rings. However, after receiving testimonial immunity and playing the jury a video of the ring removal, Officer Huber had an inconsistent exchange with the prosecutor:

> Q: This video that we played to the jury didn't show how the rings actually came off, did it?
> A: No, it did not.
> Q: Isn't it true that when Ms. Latter became aware that jail staff and fire department personnel were going to use ring cutters to remove those rings, she took them off herself?
> A: Yes, she did.

On cross-examination of another officer, the prosecutor invoked "one of [his] favorite" Mike Tyson quotes: "Everybody has a plan until they get punched in the mouth." Finally, in closing arguments, the prosecutor characterized Latter's defense as "[a] story to avoid accountability." He relied in part on the inconsistent ring testimony, stating,

> [A]s soon as she hears they are going to cut those rings off, she took them off. She could have taken those rings off at any time. She kept them on on purpose because she thought that if all else failed she would get out of jail by dismantling the sprinkler.

Later, in rebuttal, the prosecutor commented on Officer Huber's testimony:

6

If he lied during testimony, he's going to lose his job. He won't be able to work as a correctional officer any more. . . . I mean, is there anything other than losing his job and his livelihood that he has to gain out of [lying]? Absolutely not. And what Ms. Latter has done is what is happening a lot in this country right now, and I shouldn't even talk about this because I get pretty upset. But when people get in trouble, they blame law enforcement. . . . You know, she could have taken those rings off at any time which is what she did when she heard they were going to cut those rings off. And yet we hear Tim Crews and Greg Huber being drug through the mud because of that, and that's, frankly, offensive. . . . This [defense] has not been proven to a preponderance of the evidence. Not even close. I would argue that you shouldn't even consider the affirmative defense because it's just not there.

¶10 Latter raises five issues on appeal. First, she asserts that the District Court abused its discretion by excluding her witness as a discovery sanction for late disclosure, or alternatively, that her right to effective assistance of counsel was violated because her counsel missed the expert disclosure deadline. Additionally, Latter asserts that both cumulative error and prosecutorial misconduct warrant reversal. Finally, Latter argues that the officers' conduct when removing her rings was so outrageous that it shocks the universal sense of justice, warranting dismissal with prejudice.

¶11 When a party fails to comply with the witness disclosure deadline, a district court "may impose any sanction that it finds just under the circumstances, including but not limited to . . . precluding a party from calling a witness, offering evidence, or raising a defense not disclosed." Section 46-15-329(4), MCA. We review a district court's imposition of sanctions under this statute for an abuse of discretion. *State v. DeMary*, 2003 MT 307, ¶ 10, 318 Mont. 200, 79 P.3d 817 (citation omitted). A court abuses its discretion when it acts arbitrarily, without the employment of conscientious judgment, or exceeds the

bounds of reason, resulting in substantial injustice. *City of Billings v. Nolan*, 2016 MT 266, ¶ 16, 385 Mont. 190, 383 P.3d 219 (citation and quotation omitted).

¶12    The District Court did not abuse its discretion in excluding Hirsch's testimony. The imposition of discovery sanctions is highly discretionary, which "allows the court to consider the reason why disclosure was not made . . . and any other relevant circumstances." *State v. Pope*, 2017 MT 12, ¶ 25, 386 Mont. 194, 387 P.3d 870 (quoting *State v. Waters*, 228 Mont. 490, 495, 743 P.2d 617, 621 (1987)). Here, Latter's counsel was substituted on December 8, 2021, but failed to meet the disclosure deadlines by a significant margin with no apparent excuse. Though the District Court *could* have continued the trial as Latter argues on appeal, the exclusion of Latter's witnesses was well within the District Court's discretion and is a reasonable and routine sanction for late disclosure. Notably, Latter's trial counsel did not request a continuance or present any argument as to why the witnesses should not have been excluded or why his disclosures were so tardy.

¶13    Next, Latter argues that she received ineffective assistance of counsel because of the deficiencies that led to Hirsch's exclusion. Ineffective assistance of counsel (IAC) claims involve mixed questions of law and fact which we review de novo. *State v. Jefferson*, 2003 MT 90, ¶ 42, 315 Mont. 146, 69 P.3d 641. We review IAC claims using the two-part *Strickland* test under which a defendant must demonstrate by a preponderance of the evidence that (1) the counsel's performance was deficient; and (2) the deficient

performance prejudiced the defense. *State v. Valenzuela*, 2021 MT 244, ¶ 29, 405 Mont. 409, 495 P.3d 1061.

¶14 At sentencing, Hirsch was allowed to testify to his knowledge of Latter's medical history. He stated that an EKG taken at an unspecified time after December 2019 revealed a prolonged QT interval. At the time of Latter's most recent EKG in April 2021, prompted by an emergency room visit for Covid-19 and shortness of breath, Hirsch found that "she had not been having, you know, palpitations or any irregular heartbeats or chest pain or pressure." They planned to continue to monitor the prolonged QT interval, which Hirsch posited could be caused by Latter's anxiety medication. Hirsch could not corroborate Latter's condition on October 2. The District Court observed, "It's still hard to see how that relates to the offense and the offense of tampering with a sprinkler."

¶15 Latter asserts that had the jury known this medical information, "a reasonable probability exists the jury would have found that [Latter] proved her compulsion defense by a preponderance of the evidence." We disagree. Firstly, the jury heard other evidence showing Latter's health condition at the time, including Latter's own testimony, testimony from officers who interacted with her at the relevant times, and a video capturing her interactions with officers before, during, and after the flood. Secondly, it is not clear that Hirsch's testimony would have been admissible—because Latter's counsel conceded that he would not be used as an expert even if admitted, he would have been permitted to testify only to "personal knowledge of the matter." M. R. Evid. 602. "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is

9

limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony to the determination of a fact in issue." M. R. Evid. 701. Therefore, Hirsch's interpretive and diagnostic medical opinions would likely not have been admissible regardless. With this in mind, Latter cannot meet the high bar necessary to show that she was prejudiced by her counsel's alleged deficient performance that resulted in Hirsch's exclusion.

¶16 Regarding prosecutorial misconduct, Latter asserts that the prosecutor violated her right to due process and a fair trial by eliciting contradictory testimony from the officers only after securing their immunity, commenting on witness credibility, and expressing his own opinions. We generally do not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial. *State v. Palafox*, 2023 MT 26, ¶ 17, 411 Mont. 233, 524 P.3d 461. However, we may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made, under plain error review. *State v. Lackman*, 2017 MT 127, ¶ 9, 387 Mont. 459, 395 P.3d 477. We exercise plain error review when failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *Lackman*, ¶ 9. Plain error review is exercised sparingly on a case-by-case basis. *Lackman*, ¶ 9.

¶17 The "mere assertion that constitutional rights are implicated or that failure to review the claimed error may result in a manifest miscarriage of justice is insufficient to implicate

the plain error doctrine." *State v. Gunderson*, 2010 MT 166, ¶ 100, 357 Mont. 142, 237 P.3d 74. That is the case here, because Latter fails to "show that the argument violated [her] substantial rights." *State v. Aker*, 2013 MT 253, ¶ 24, 371 Mont. 491, 310 P.3d 506 (quotation and citation omitted). First, the officers' testimony about how her rings were removed is immaterial to both the charge and the defense and therefore does not violate any rights. Second, Latter's medical records and Hirsch's testimony, even if admitted, could not have shown that Latter was experiencing cardiac distress at the time in question. Therefore, the prosecutor's comment that there was "no evidence" to support Latter's statements regarding her subjective belief that she was experiencing a medical episode on October 2 also did not violate any rights. The prosecutor's comments on the officers' credibility and his opinion on public perception of law enforcement may have been inappropriate, but they do not constitute a violation of Latter's substantial rights. Because Latter's counsel failed to object at trial, and because she does not show how the prosecutor violated her substantial rights, we decline to exercise plain error review.

¶18 Next, Latter argues that cumulative error created by the missed disclosure deadline, Hirsch's exclusion, and the alleged ineffective assistance and prosecutorial misconduct warrants reversal. "The cumulative error doctrine applies in the rare case in which several errors occur, the cumulative effect of which is to deny the defendant the right to a fair trial." *State v. Severson*, 2024 MT 76, ¶ 45, 416 Mont. 201, 546 P.3d 765 (citing *State v. Novak*, 2005 MT 294, ¶ 35, 329 Mont. 309, 124 P.3d 182). The defendant is required to prove that the aggregate effect of the errors denied them a fair trial; mere allegations and speculation

11

that prejudice occurred are insufficient. *Severson*, ¶ 45. When considering the cumulative effect of several claimed errors, we consider

> each such claim against the background of the case as a whole, paying particular weight to the factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose . . . ; and the strength of the government's case.

*Severson*, ¶ 46 (quoting *State v. Lawrence*, 2016 MT 346, ¶ 30, 386 Mont. 86, 385 P.3d 968 (Baker, J., concurring) (internal quotation omitted)).

¶19 Latter alleges that prejudice occurred as a result of each of the aforementioned issues. Again, we disagree that she has shown how she was prejudiced by even one of these asserted errors, let alone multiple. We emphasize that it is not clear that Hirsch's testimony would have been admissible even if he were allowed to testify. Latter was allowed to present all the evidence she had of her mental and physical state in the form of testimony and video and make a full case. The record does not support that she was deprived of her right to a fair trial and we decline to reverse on these grounds.

¶20 Finally, Latter asserts that the officers' conduct when they were removing her rings was so outrageous as to warrant plain error review and dismissal of the charges with prejudice. In limited circumstances where the government's conduct is sufficiently outrageous, a defendant may be entitled to dismissal of the charges for violation of his due process rights. *See State v. Peoples*, 2022 MT 4, ¶ 38, 407 Mont. 84, 502 P.3d 129 (Baker, J., concurring); *State v. Williams-Rusch*, 279 Mont. 437, 444-45, 928 P.2d 169, 173-74 (1996) (discussing federal treatment of outrageous government conduct defense). When

12

the defendant does not "show how the alleged police misconduct violated the defendant's constitutional rights relating to the crimes charged," their remedy is a civil action. *Williams-Rusch*, 279 Mont. at 445-46, 928 P.2d at 174.

¶21 Here, even if we did apply plain error review, the police conduct in Latter's case does not relate to the crimes charged; it took place after the events at issue. Some of the dialogue with police before Latter triggered the fire sprinkler system does relate to her allegation that she felt that was the only way she could get help, but the officers' conduct in those interactions is not "so grossly shocking and so outrageous as to violate the universal sense of justice." *State v. Fitzpatrick*, 2012 MT 300, ¶ 21, 367 Mont. 385, 291 P.3d 1106 (quoting and discussing Ninth Circuit test as in *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)).

¶22 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶23 The District Court is affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE