FILED

02/07/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0179

DA 21-0179

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 26

STATE OF MONTANA,

     Plaintiff and Appellee,

    v.

DOMINGO JOSE PALAFOX,

     Defendant and Appellant.

APPEAL FROM:   District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DC 20-44
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

     Pete Wood, Attorney at Law, Boise, Idaho

     For Appellee:

     Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant Attorney General, Helena, Montana

     Marcia Jean Boris, Lincoln County Attorney, Libby, Montana

Submitted on Briefs:  November 10, 2022

Decided:   February 7, 2023

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Domingo Jose Palafox (Palafox) appeals his conviction and sentence entered in the Nineteenth Judicial District Court, Lincoln County, for two counts of felony tampering with witnesses, in violation of § 45-7-206, MCA. We affirm.

¶2 We restate the following issues for review:

1. *Did the State present sufficient evidence to support Palafox's convictions for witness tampering?*

2. *Should this Court exercise plain error review to consider unpreserved allegations of prosecutorial misconduct?*

3. *Did trial counsel's failure to object to alleged misconduct by the prosecutor constitute ineffective assistance of counsel?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 In spring of 2020, Palafox showed a video to Gideon Davis (Gideon), his long-time friend. The video depicted Palafox tying his dog to a tree and lighting it on fire. Gideon told Palafox he had gone too far, angering Palafox. At some point, Palafox and Gideon discussed the video again. Gideon told Palafox that people knew Palafox had done it and that a lynch mob would likely show up at his door if he was not careful.

¶4 A few weeks after Palafox showed Gideon the video, Palafox told Gideon that if anyone spoke up about the video, he would put a $10,000 hit on their head. At the time, Gideon was still contemplating whether he should speak up about the video, and Palafox's threat concerned him. Gideon understood the threat to mean anyone who snitched "was dead" and knew that Palafox had the ability to carry out the threat. Gideon stopped socializing with Palafox after this interaction. On June 11, 2020, Palafox and his girlfriend Winter Haugen (Haugen) drove to Gideon's family home. When Palafox pulled up to the

house, he began honking and yelling at Jeremiah Davis (Jeremiah), Gideon's brother. This incident and an incident occurring shortly thereafter at the local Town Pump serve as the basis for the State's charges of witness tampering.

¶5 Palafox was eventually charged with two counts of tampering with witnesses, felonies, in violation of § 45-7-206, MCA, and aggravated animal cruelty, a felony, in violation of § 45-8-217, MCA. Palafox pleaded guilty to aggravated animal cruelty. On December 23, 2020, a nonjury trial was held on the witness tampering counts. At the close of the State's case, Palafox moved to dismiss both counts for insufficient evidence, which the District Court denied. The District Court found Palafox guilty of each count of witness tampering and imposed a sentence of ten years on one count and a consecutive ten-year sentence on the second count. Only the sentence for the second witness tampering count was suspended. The District Court also imposed two years on the count charging aggravated animal cruelty. The sentences on all counts were run consecutively. Palafox appeals only his convictions for witness tampering.

¶6 During the bench trial, Jeremiah testified that on June 11, 2020, Palafox and Haugen drove to Gideon's house and Palafox began yelling he was going to have Gideon taken care of, that he was a snitch, and that he would see him in court. Gideon testified that Palafox yelled at him that he and his family "were done for" and that "I was a narc, I was going to get killed. He was putting a hit out on me and my family is not safe anymore." Gideon testified that Palafox was not only threatening him directly, but also Jeremiah since Jeremiah is "a member of my family," and he did not "see how [Jeremiah is] not being threatened if he says your family is done."

¶7 Palafox called one witness at trial, his partner Haugen. Haugen testified that she was in the car with Palafox and witnessed the encounters between Palafox, Gideon, and Jeremiah. She testified that first Jeremiah came out of the house and Palafox told him "tell your brother I know he's a narc and I'll see him in court," and then when Gideon walked outside, Palafox told him "I know you are a narc I'll see you in court." According to Haugen, Palafox did not say anything else to Gideon or Jeremiah. Haugen testified that before this incident, Palafox tried to contact his lawyer "to see what he could do about slander charges" against Gideon and so "see him in court" referred to a legal matter. However, Jeremiah testified that Palafox never mentioned a lawsuit, slander, or lawyers.

¶8 A few minutes after this incident at the house, another incident occurred between Palafox and Jeremiah at the local Town Pump. Jeremiah testified that while at the Town Pump for gas, Palafox drove up and began threatening Gideon, "[s]aying he was going to have him taken care of, and I'll see you in court and a bunch of other stuff." Jeremiah confronted Palafox and followed him into the Town Pump as Palafox was "running his mouth." Inside, Palafox "was talking and yelling and he was spitting in [Jeremiah's] face," so Jeremiah pushed him away. Jeremiah was charged with assault, but ultimately pleaded guilty to disturbing the peace. Jeremiah testified that he interpreted Palafox's threats to mean Palafox would "have us dealt with, send someone out to beat us up or something like that," rather than take his family to court.

¶9 Conversely, Haugen testified that she observed the entire Town Pump incident while sitting in their vehicle parked on the side of the road. According to her, after they parked, Palafox did not speak to anyone. She testified that there was no interaction between

Palafox and Jeremiah outside the Town Pump. Instead, Palafox first walked into the store alone. After he entered, Jeremiah ran inside after him. Haugen testified that as far as she saw, Palafox did not taunt or threaten Jeremiah in any way, nor did he interact with Jeremiah until after Jeremiah ran inside. On cross-examination, Haugen was questioned about her observations and a surveillance video, which was not entered into evidence, as follows:

Q: [Prosecutor]: Is it your testimony that [Palafox] did not threaten Jeremiah or his brother in any way?

A: [Haugen]: No, he didn't.

Q: [A]re you aware that there is video surveillance of that parking lot?

A: Yes, I am. Yes.

Q: And if the video that was reviewed that day relating to this incident indicated that [Palafox] was, in fact, interacting with Jeremiah . . . is it still your testimony that that didn't happen?

A: I didn't see it. So . . .

Q: Okay. So you're not testifying it didn't happen, you are just testifying you didn't see it?

A: Yes.

¶10 Haugen also testified that she knew Palafox was angry when they drove to the house that day. She said he was upset because he had discovered Gideon was "saying stuff" about how Palafox had hurt one of their dogs. When asked on cross-examination how Palafox knew Gideon was saying things, Haugen responded she told Palafox about it after she found out on Facebook. Additionally, Haugen testified that she knew Palafox had been accused of lighting the dog on fire but that she did not believe it was their dog. Text

messages on Haugen's seized cellphone, however, demonstrated that she knew the dog was hers.

¶11 Although Gideon did not make a report of the video until after the Town Pump incident, he had contacted an individual on the Troy Montana website to try to get the contact information of the City's Chief of Police, Katie Davis. Gideon testified that later, Chief Davis contacted him after discovering he was trying to reach her and he discussed the video with her.

¶12 Chief Davis investigated the animal cruelty incident and reviewed the surveillance video of the Town Pump incident. Chief Davis testified that the video showed Palafox walking towards the Town Pump store and turning and talking towards the fuel pumps where Jeremiah was. Chief Davis stated that Jeremiah "went from pumping fuel to being instantly upset and going in afterwards." Further, the following exchange took place regarding Haugen's testimony about the incident:

> Prosecutor: And was your review of the video consistent with Ms. Haugen's testimony a few minutes ago about what took place in the parking lot?

> Chief Davis: She would not have been able to see it from her vantage point.

¶13 Chief Davis testified that she first received a report about a distressed dog on March 9, 2020. Chief Davis found the dog curled up under a pine tree in very bad shape and very weak. The dog had multiple injuries. Chief Davis took a photo of the dog and sent it to the city Facebook page to find the dog's owner. The dog was eventually fostered by the Pet Connection Sanctuary. Chief Davis also testified that there was a lot of publicity about the incident and that she received tips that Palafox was the dog's owner. Around the end of March or beginning of April, Chief Davis followed up on the tips and attempted to

contact Gideon. Gideon's father answered the phone and told Chief Davis that she would not be speaking with Gideon because Gideon had been told to watch his back, which Chief Davis interpreted to mean that Gideon was afraid to speak with her.

¶14 In mid-May, a few weeks before the June 11 incident between Palafox, Jeremiah, and Gideon, Chief Davis contacted Palafox to inform him there was a pending investigation into what happened to the dog. She testified it was her perception that Palafox believed Gideon had already spoken to law enforcement when he went to the house on June 11. On June 15, Chief Davis spoke with Gideon and Jeremiah. For the first time, Gideon told Chief Davis about Palafox's video depicting animal cruelty. Gideon and Jeremiah expressed fear of Palafox and stated they anticipated extreme violence.

¶15 On appeal, Palafox contends that the State failed to present sufficient evidence to support his convictions for witness tampering. As a result, the District Court improperly denied Palafox's motion to dismiss and improperly found Palafox guilty of both counts of witness tampering. Further, Palafox contends that he was denied a fair trial due to prosecutorial misconduct, and that his defense counsel's failure to object to that misconduct deprived him of the effective assistance of counsel.

## STANDARD OF REVIEW

¶16 We review a district court's denial of a motion to dismiss a criminal charge for insufficient evidence de novo. *State v. Hren*, 2021 MT 264, ¶ 16, 406 Mont. 15, 496 P.3d 949 (citations omitted). Likewise, we review de novo whether sufficient evidence supports a conviction. *State v. Polak*, 2018 MT 174, ¶ 14, 392 Mont. 90, 422 P.3d 112 (citations omitted). We review the sufficiency of the evidence in the light most favorable to the

prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Colburn*, 2016 MT 246, ¶ 7, 385 Mont. 100, 386 P.3d 561; *Hren*, ¶ 16 (citations omitted).

¶17 We generally do not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial. *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506. However, we may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made, under plain error review. *State v. Lackman*, 2017 MT 127, ¶ 9, 387 Mont. 459, 395 P.3d 477. We exercise plain error review when failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *Lackman*, ¶ 9. Plain error review is exercised sparingly, on a case-by-case basis, and only in this narrow class of cases. *Lackman*, ¶ 9.

¶18 Ineffective assistance of counsel (IAC) claims present mixed questions of law and fact and are reviewed de novo. *State v. Chafee*, 2014 MT 226, ¶ 11, 376 Mont. 267, 332 P.3d 240.

**DISCUSSION**

¶19 1. *Did the State present sufficient evidence to support Palafox's convictions for witness tampering?*

¶20 Under § 45-7-206, MCA, a person tampers with witnesses if, believing that an official proceeding or investigation is pending or about to be instituted, the person purposely or knowingly attempts to induce or otherwise cause a witness or informant to:

(a) testify or inform falsely;
(b) withhold any testimony, information, document, or thing; [or] . . .
(d) not appear at any proceeding or investigation to which the witness or informant has been summoned.

¶21 Palafox argues that the State presented insufficient evidence that on June 11, 2020, Palafox believed Gideon was or would act as an informant in the animal cruelty investigation. Palafox reasons that Gideon did not speak with law enforcement until after the June 11 incident where he made threats to Gideon and Jeremiah. However, Palafox knew he showed the video depicting animal cruelty to Gideon months earlier. Moreover, Chief Davis testified that she informed Palafox in May of the animal cruelty investigation. Haugen, Palafox's partner, also testified that she knew before June 11 that Palafox had been accused of lighting their dog on fire. She admitted that Palafox initiated the events on June 11 because he was upset after learning from her that Gideon was "saying stuff" on Facebook about Palafox hurting the dog. Regardless of whether Palafox believed Gideon had already reported the video to law enforcement, this testimony demonstrates that Palafox knew that there was an animal cruelty investigation and believed that Gideon had been speaking up about it.

¶22 Palafox argues he confronted Gideon on June 11 because Gideon was slandering him on Facebook. Palafox maintains that when he said "I'll see you in court," he was referring to suing Gideon for slander. Additionally, Palafox argues all the witnesses agreed Palafox said, "I'll see you in court." However, while Jeremiah testified Palafox threatened to see Gideon in court, he testified that Palafox also threatened "he was going to have [Gideon] taken care of." And Gideon testified that Palafox threatened that Gideon and his family "were done for"; that "[Gideon] was a narc, [who] was going to get killed"; and that

"[Palafox] was putting a hit out on [Gideon] and [his] family is not safe anymore." These threats clearly go beyond threatening to sue Gideon for slander.

¶23 When rendering its guilty verdict, the District Court stated that even *if* all Palafox said was "I know you are [a] narc I will see you in court," all the elements of witness tampering would be met because "threatening to sue the guy for something that you admit later that you did is an attempt to get him to either withhold his testimony or to testify falsely." The District Court did not find that Palafox's *only* threat to Gideon was "I'll see you in court." The State introduced ample evidence that Palafox's threats exceeded a civil lawsuit. Both Gideon and Jeremiah testified that Palafox threatened to physically harm Gideon and his family or even have them killed. Further, before this incident, Palafox threatened to have anyone who spoke about the video killed. Reviewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to support Palafox's witness tampering conviction involving Gideon.

¶24 Regarding the witness tampering count involving Jeremiah, Palafox argues the District Court rejected the possibility that Palafox believed Jeremiah would serve as a witness in the animal cruelty investigation when it ruled that Jeremiah "never saw the video" depicting animal cruelty. However, witness tampering merely requires a defendant believe an "official investigation is pending or about to be instituted . . . ." Section 45-7-206, MCA. At the time of each alleged count of witness tampering, Palafox knew he was being investigated for animal cruelty. It was not necessary for Jeremiah to have actually seen the video. Further, the testimony shows Palafox's statements to Jeremiah at the Town Pump were intended to thwart Jeremiah's participation in an official

investigation. Jeremiah witnessed Palafox threatening Gideon that he and his family "were done for" and that he was going to put "a hit out on me and my family is not safe anymore." Gideon testified that Palafox's threats were also aimed at Jeremiah, explaining "I don't see how [Jeremiah is] not being threatened if he says your family is done." At the Town Pump, Jeremiah testified that Palafox continued "threatening my brother . . . [s]aying he was going to have him taken care of, and I'll see you in court and a bunch of other stuff." Jeremiah believed Palafox would "have us dealt with, send someone out to beat us up or something like that."

¶25 Finally, while Haugen initially testified that Palafox did not speak to Jeremiah, on cross-examination she admitted she could not see the interaction. The District Court found that Haugen "testified that she wasn't in a position to see what happened as [Palafox] walked into that store." Moreover, the court explicitly found Jeremiah to be a credible witness. The testimony of a single witness "is sufficient to prove a fact . . . ." *State v. McCoy*, 2021 MT 303, ¶ 30, 406 Mont. 375, 498 P.3d 1266 (citation omitted). Reviewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Palafox's witness tampering conviction involving Jeremiah.

¶26 *2. Should this Court exercise plain error review to consider unpreserved allegations of prosecutorial misconduct?*
¶27 Palafox contends that his conviction should be reversed because of prosecutorial misconduct and asks the Court to review this unpreserved issue under the plain error doctrine. Criminal defendants have a right to a fair trial under the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution. A prosecutor's misconduct may be grounds for reversing a conviction and granting a new

trial if it deprives the defendant of a fair and impartial trial. *State v. Hayden*, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091 (citations omitted). However, we will not presume prejudice from the alleged misconduct; rather, the defendant must demonstrate that the alleged misconduct violated his substantial rights. *State v. Christensen*, 2020 MT 237, ¶ 79, 401 Mont. 247, 472 P.3d 622. Moreover, we do not isolate the challenged comments on review but consider the challenged comments in the context of the trial and the closing argument as a whole. *Christensen*, ¶ 79.

¶28 Palafox asserts the State improperly referred to evidence outside the record; misstated evidence in the record; and, during closing arguments, repeatedly and impermissibly commented on the credibility of a witness. Palafox's argument consists primarily of describing the incidents he contends were improper. While Palafox describes each instance of misconduct, he does not explain how they caused him prejudice; he simply recites each example of misconduct and asserts he was prejudiced. "[A] mere assertion . . . is insufficient to implicate the plain error doctrine." *State v. Gunderson*, 2010 MT 166, ¶ 100, 357 Mont. 142, 237 P.3d 74. Palafox has not demonstrated that failing to address the claimed errors would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. Accordingly, we decline to exercise plain error review of Palafox's claims of prosecutorial misconduct.

¶29 *3. Did trial counsel's failure to object to alleged misconduct by the prosecutor constitute ineffective assistance of counsel?*

¶30 Palafox claims he was denied the effective assistance of counsel when his trial counsel did not object to the alleged instances of prosecutorial misconduct. A defendant's

right to effective assistance of counsel is guaranteed by both the United States and Montana Constitutions. *Chafee*, ¶ 17. We review IAC claims on direct appeal if the claims are based solely on the record. If the record does not demonstrate the reasons for counsel's actions, the claim is more suitable for postconviction relief proceedings where the record can be developed. *State v. Cheetham*, 2016 MT 151, ¶ 14, 384 Mont. 1, 373 P.3d 45 (citations omitted). The "failure to object to the introduction of evidence, or to object to the testimony of a witness, or object to prosecutorial misconduct at trial" may be considered a record-based claim appropriate for direct appeal. *State v. White*, 2001 MT 149, ¶ 15, 306 Mont. 58, 30 P.3d 340. However, because the use of objections is within counsel's tactical discretion, we will not review the matter unless the record explains why counsel failed to object. *Aker*, ¶ 35 (citations omitted).

¶31 Palafox contends the prosecutor committed the following instances of misconduct: questioning Haugen and Chief Davis about the Town Pump video surveillance without submitting the video into evidence; questioning Chief Davis about text messages showing Haugen knew it was her dog in Facebook posts without submitting the text messages into evidence; and misstating evidence and attacking Haugen's credibility during closing arguments.

¶32 After describing the multiple instances in which he claims defense counsel's failure to object was constitutionally deficient, Palafox states that "[t]here is simply no strategic reason whatsoever to sit idly by and allow the prosecutor to repeatedly engage in such harmful conduct." However, defense counsel may have decided not to object based upon trial strategy. For example, instead of objecting to the prosecutor's attacks on Haugen's

credibility, in closing arguments defense counsel reframed Chief Davis's rebuttal testimony about the Town Pump surveillance video as consistent with Haugen's testimony. He argued Chief Davis confirmed Haugen's testimony that she was not in a position to see what occurred between Palafox and Jeremiah. Thus, defense counsel may have chosen to reframe Chief Davis's video surveillance testimony instead of objecting. The trial record does not support a claim of IAC on direct appeal.

## CONCLUSION

¶33 We conclude there was sufficient evidence to support Palafox's convictions of witness tampering pursuant to § 45-7-206, MCA; the challenged instances of prosecutorial misconduct do not rise to a level sufficient to invoke plain error review; and Palafox's IAC claim on direct appeal is denied without prejudice, because it is not record based.

¶34 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE