FILED

09/17/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0567

DA 21-0567

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 209

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

GARRETT MICHAEL O'HOWELL,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. ADC-2020-21
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Jeff N. Wilson, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

          Cory Swanson, Broadwater County Attorney, Townsend, Montana

Submitted on Briefs:  December 6, 2023

Decided:  September 17, 2024

Filed:

                  _____
                            Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1    Defendant Garrett Michael O'Howell appeals the January 12, 2021, Order denying his motion to suppress evidence and dismiss the charges and the September 3, 2021, Judgment and Commitment by the First Judicial District, Broadwater County.  We address:

> *Issue One: Whether the District Court erred when it denied O'Howell's motion to suppress.*
> *Issue Two: Whether there was sufficient evidence to support the jury's verdict.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    O'Howell was arrested following a traffic stop on May 4, 2020, at around 8:30 pm. The stop involved O'Howell and three others.

¶3    Broadwater County Sherriff's Deputy Tony Cordova observed a parked vehicle in the parking lot of the Townsend Town Pump and believed the two men sitting in the back were behaving in an odd manner.  Cordova contacted the Broadwater County Sheriff dispatch and reported the vehicle information asking the dispatcher to identify the registered owner.  The dispatcher informed Cordova the vehicle was registered to Kaitlyn Smock, whose privilege to drive was revoked.

¶4    A man and a woman, later identified as Smock, exited Town Pump and Smock drove out of the Town Pump parking lot and headed south on Highway 287.  After following for a while, Cordova pulled the vehicle over for going 52-mph in a 45-mph zone and because the registered owner's driver's license was revoked.  When asked to provide her driver's license and car registration, Smock stated she did not have those documents with her but confirmed that she was the registered owner.  Cordova then asked the passengers in the

2

vehicle if they had valid driver's licenses on them. All responded that they did not. O'Howell stated that his driver's license had been stolen. A passenger later identified as Donald Hamlin responded that he had a learner's permit. Cordova inquired if anyone in the car was on probation or parole and Hamlin replied that he was. Cordova stated, "we got to figure out who's going to drive" and asked each passenger for their names and dates of birth. Hamlin and O'Howell provided the requested information. A third passenger stated his name was "Adam Johnson," but was later determined to be Kody Laird.

¶5 Cordova told Smock to go to his vehicle with him where he provided the passengers' names to dispatch along with the information he learned about their licenses and probation statuses. While talking to Smock about the details of her revocation Cordova asked "[i]s there something illegal in that vehicle . . .? All three of your guys are, sketching out and looking back at us. They are doing something in there." Smock denied knowing there was anything illegal in the car and suggested that Hamlin could drive. Cordova replied that he believed there were restrictions on when a person with only a learner's permit could drive.

¶6 About 12 minutes after the stop began, dispatch relayed that O'Howell had a $50,000 warrant out for his arrest. Cordova instructed Smock to remain in the car while he "talk[ed] with" O'Howell. Cordova and Montana Highway Patrol Trooper Makenzie Gifford, who had arrived on the scene, patted O'Howell down, placed him in handcuffs, and moved him to the back seat of Cordova's vehicle. Cordova continued writing out the citation to Smock and explained that he needed to follow up on Hamlin's probation status.

¶7 Suddenly, Hamlin exited the vehicle and Laird moved from the back seat to the driver's seat and drove away. Cordova unsuccessfully attempted to stop Laird. Gifford

3

returned to her patrol car and pursued the fleeing vehicle. Cordova transported O'Howell to the detention center, leaving Hamlin and Smock at the scene.

¶8 After the pursuit ended, Cordova obtained a search warrant to search Smock's vehicle. The search revealed 116.7 grams of methamphetamine in multiple bags along with drug paraphernalia and four "loaded" syringes.

¶9 Smock was charged with two traffic violations and criminal possession of methamphetamine for a small baggie found under the driver's seat. Hamlin was charged with criminal possession of dangerous drugs with intent to distribute. Laird was charged with criminal endangerment for the highspeed chase. O'Howell was charged with accountability to criminal possession of dangerous drugs with intent to sell and possession of drug paraphernalia.

¶10 O'Howell moved to suppress the evidence discovered in Smock's vehicle, arguing in part that Cordova exceeded the scope of the investigative stop. An evidentiary hearing was held on December 10, 2020, after which the District Court denied O'Howell's motion. In the court's January 12, 2021, Order, the court concluded that Cordova had particularized suspicion to stop Smock's vehicle based on her exceeding the speed limit; O'Howell had not been subjected to a custodial interrogation when the deputy was trying to determine if any of the three passengers had a valid driver's license; and Cordova lawfully arrested O'Howell based on his outstanding warrant.

¶11 A two-day Jury Trial was held on May 3 and 4, 2021. Smock and Laird testified for the State. Hamlin did not testify. Smock testified that when O'Howell had asked her to drive him and some friends to Billings she had initially declined but eventually was

4

persuaded to drive. Smock testified that O'Howell had initially driven her car to pick up Laird and Hamlin ,but once at the Townsend Town Pump he switched with Smock because he wanted to get high. Smock testified that it was not until after Laird had stolen her car and she was on the side of the highway with Hamlin that she learned that Hamlin had a large quantity of drugs in the car.

¶12 Laird testified that he had asked O'Howell about helping Hamlin get to Billings and that he had told O'Howell that Hamlin would give him money and drugs so they could get high on their way to Billings. Laird testified that he had told O'Howell that Hamlin had a large quantity of drugs with him that he was intending to sell. Laird testified as to the group's movements including switching drivers at the Townsend Town Pump.

¶13 Cordova testified that he had obtained a search warrant for the car and described what evidence was discovered and where in the car it was found. Videos from Cordova's body camera and patrol car were played for the jury. Gifford testified about assisting Cordova and described the pursuit of Laird as erratic.

¶14 O'Howell was the sole witness for the defense. He testified that he had contacted Smock about getting a ride and knew that she had people at her house. He testified that he was driving at first, but he was driving poorly because it was dark and he had difficulty seeing when there were oncoming headlights so he switched driving with Smock at the Townsend Town Pump.

¶15 After being instructed on the offenses and being provided an accomplice instruction, the Jury found O'Howell guilty of both Criminal Possession of Dangerous Drugs with Intent to Distribute (by accountability) and Criminal Possession of Drug Paraphernalia.

**STANDARDS OF REVIEW**

¶16     We review a district court's ruling on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were applied correctly as a matter of law. *State v. Carrywater*, 2022 MT 131, ¶ 11, 409 Mont. 194, 512 P.3d 1180 (citation omitted). A finding is clearly erroneous if it is not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if review of the record gives the Court a firm conviction that the trial court made a mistake. *Carrywater*, ¶ 11.

¶17     We review de novo whether sufficient evidence supports a conviction. *State v. Palafox*, 2023 MT 26, ¶ 16, 411 Mont. 233, 524 P.3d 461 (citation omitted). We "review the sufficiency of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Palafox*, ¶ 16 (citations omitted).

**DISCUSSION**

¶18     *Issue One: Whether the District Court erred when it denied O'Howell's motion to suppress.*

¶19     O'Howell argues the District Court erred in denying his motion to suppress evidence derived from the stop. O'Howell contends that Officer Cordova unlawfully extended the stop and unlawfully seized him by requesting his identification and information. O'Howell argues that all evidence seized as a result of the unlawful extension must therefore be suppressed.

¶20    Article II, Section 11, of the Montana Constitution and the Fourth Amendment to the United States Constitution provide individuals protection from unreasonable searches and seizures. Montana's Constitution provides broader privacy protection relative to the United States Constitution. *See State v. Noli*, 2023 MT 84, ¶ 28, 412 Mont. 170, 529 P.3d 813. Investigative stops of persons by police, including traffic or vehicle stops, are constitutional "seizures" subject to the warrant and probable cause requirements of the Fourth Amendment and Article II, Section 11. *Noli*, ¶ 29.

¶21    A temporary investigative stop, or *Terry* stop, is a recognized exception to the Fourth Amendment and Article II, Section 11 warrant and probable cause requirements. *State v. Gopher*, 193 Mont. 189, 192-94, 631 P.2d 293, 295-96 (1981) (recognizing and applying the temporary investigative stop exception first enunciated in *Terry v. Ohio*, 392 U.S. 1, 15-16, 88 S. Ct. 1868, 1876-77 (1968)). Under this narrow exception, a police officer may stop a vehicle or person when there exists "a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense." Section 46-5-401(1), MCA; *see also Noli*, ¶ 30.

¶22    Police must act with reasonable diligence to confirm or dispel the particularized suspicion and any subsequent expansion in duration or scope must be based on new or additional particularized suspicion. *State v. Panasuk*, 2024 MT 113, ¶ 14, 416 Mont. 430, 549 P.3d 432 (citing *Noli*, ¶¶ 33, 35). "Thus, on a valid traffic stop, the tolerable duration of police inquiry is limited to the time necessary to address the traffic violation and *any related safety concerns*." *Panasuk,* ¶ 14 (emphasis added). During a lawful stop, a police officer may "request the person's name and present address and an explanation of the

7

person's actions and, if the person is the driver of a vehicle, demand the person's driver's license and the vehicle's registration and proof of insurance." Section 46-5-401(2)(a), MCA.

¶23 O'Howell agrees that Cordova lawfully stopped the car after learning the car's owner had a revoked license and determining that the car was speeding. The issue for our consideration, therefore, is whether Cordova's questioning of the three passengers was reasonably related to the safety concerns raised by the traffic violations he was investigating. O'Howell argues that Cordova unlawfully extended the stop to request and process his name and birthdate, citing our decision in *State v. Strom*, 2014 MT 234, 376 Mont. 277, 333 P.3d 218.

¶24 In *Strom*, an officer observed a vehicle legally parked in a public use-area with two occupants inside. *Strom,* ¶ 4. The officer believed it was suspicious, so he approached the vehicle and asked for the driver's license of the woman seated in the driver's seat. *Strom,* ¶¶ 4-5. After informing the officer that she didn't have a driver's license, the officer asked the passenger, Strom, for identification. *Strom,* ¶ 5. The officer took the driver's school ID and Strom's Identification Card and instructed the occupants to wait while he checked on the driver's status and for warrants. *Strom*, ¶ 5. The officer learned that Strom had an outstanding warrant and placed her under arrest. At the detention center, Strom advised the detention officer she had a baggie of methamphetamine. Strom was charged with one count of criminal possession of dangerous drugs. *Strom,* ¶¶ 5-6.

¶25 Strom moved to suppress the evidence and statements, arguing that the Officer lacked particularized suspicion to perform an investigatory stop when he asked her and the

8

passenger for identification. *Strom*, ¶ 7. We agreed with Strom and held that the officer's belief that the parked vehicle was suspicious was insufficient to support his initial stop and request for identification, requiring that all subsequently discovered evidence be suppressed. *Strom*, ¶ 17.

¶26 O'Howell's reliance on *Strom* is misplaced. First, unlike in *Strom*, where the investigation lacked reasonable suspicion from the outset, O'Howell does not challenge the basis for the initial stop. Once Cordova confirmed that Smock was the driver and determined her license was revoked, he had to contend with the safety concerns raised by a driverless vehicle parked on the side of the highway. Cordova testified that he does not allow a driver with a suspended license to continue to drive from that location, so he ordinarily tries "to find a valid driver inside the vehicle to switch her spots and drive." Cordova testified that if one of the passengers had produced a valid license, he would have simply let them go on their way after issuing citations to Smock. When none of the passengers could produce a valid driver's license, he requested their personal information simply to verify whether the vehicle could be entrusted to any of them.

¶27 O'Howell points to our decisions in *State v. Wilson*, *State v. Carrywater*, and *State v. Broken Rope* to assert that Cordova lacked particularized suspicion to extend the stop. *State v. Wilson*, 2018 MT 268, ¶ 38, 393 Mont. 238, 430 P.3d 77; *Carrywater*, ¶¶ 4-5, 27; *State v. Broken Rope*, 278 Mont. 427, 432-33, 925 P.2d 1157, 1160 (1996). Those cases involved officers who extended traffic stops based on unsupported suspicions of drug-related activity. Cordova did not extend the stop for any unlawful purpose. Rather, upon making the stop and determining that the driver was not licensed to continue driving,

9

the logical next step was to assess whether there was anyone else in the car who *could* drive. O'Howell could have responded to Cordova's questioning by saying that he did not have a valid license or that he did not wish to answer the question, but Cordova did not exceed the scope of the stop by asking.[1]

¶28 The District Court correctly determined that Cordova's questioning did not go beyond the extent of the valid traffic stop.

¶29 *Issue Two: Whether there was sufficient evidence to support the jury's verdict.*

¶30 O'Howell argues that there was insufficient evidence to support the jury's verdict because the State failed to corroborate the accomplices' testimony that O'Howell knew about Hamlin's intent to distribute meth.

¶31 Section 46-16-213, MCA, states that to convict someone based on accomplice testimony, the state must corroborate the testimony "by other evidence that in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense." Crimes, wrongs, or acts other than those which the defendant is charged do not need to be corroborated before it is admissible. *State v. Byers*, 2003 MT 83, ¶ 15, 315 Mont. 89, 67 P.3d 880. Whether accomplice testimony is sufficiently corroborated depends on the circumstances of each case. *State v. Tollie*, 2022 MT 59, ¶ 15, 408 Mont. 129, 506 P.3d 1021 (citing *State v. Kemp*, 182 Mont. 383, 387, 597 P.2d 96, 99 (1979)). Corroborating

---

[1] O'Howell does not suggest how Cordova was meant to relocate the driverless car without finding another driver, possibly because the obvious alternative, impoundment, would likely have led to the discovery of the very evidence O'Howell seeks to suppress.

evidence can be circumstantial and does not need to extend to every fact from an accomplice's testimony but must raise some "independent connection with the defendant that is apparent without reference to the accomplice testimony." *Tollie*, ¶ 15 (citation omitted). Corroborating evidence that "simply describes the occurrence or circumstances of a crime" is not sufficient. *Tollie*, ¶ 15 (citation omitted).

¶32 The State argues that Smock's testimony did not need to be corroborated to be admissible because there was insufficient evidence to establish that Smock was legally accountable for the five individually wrapped baggies of methamphetamine that Hamlin planned to sell in Billings, making the jury free to consider her testimony without any accomplice limitations. *See Byers*, ¶ 15. Whether or not this may be the case, even if Smock was considered to be an accomplice, her and Laird's testimony is corroborated by O'Howell's own statements and testimony, the deputy's video, and the physical evidence recovered from the vehicle.

¶33 Hamlin pled guilty to the distribution for which O'Howell was convicted by accountability. O'Howell told Cordova that Hamlin was his "homeboy." The deputy's video from the scene and O'Howell's own statements corroborate that the group was traveling to Billings, that Smock did not know Laird well and had never met Hamlin before, and that she was initially reluctant to go to Billings because she had friends staying with her. O'Howell's own testimony confirmed that he contacted Smock to arrange for the ride to Billings for himself, Laird, and Hamlin and, in fact, O'Howell was the one originally driving Smock's car before they switched places. Smock testified that they only switched places so that she could drive because O'Howell wanted to get high during the drive, which

was corroborated by the loaded syringe that was found near the passenger seat where O'Howell was sitting.

¶34 Considered in a light most favorable to the State, the record supports the determination that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Palafox*, ¶ 16.

## CONCLUSION

¶35 The District Court did not err by denying O'Howell's motion to suppress because the initial detention was not extended beyond what was necessary to effectuate the initial purpose of the stop. The State presented sufficient evidence to convict O'Howell of accountability to criminal possession of dangerous drugs with intent to sell. We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE